STATE of North Dakota, Plaintiff
and Appellee,

v.

Richard W. SKJONSBY, Defendant and
Appellant. (Two cases)

Cr. Nos. 749–A, 802.

Supreme Court of North Dakota.

May 20, 1982.

Larry E. Stern and Bruce D. Quick, Asst. State's Attys., Fargo, for plaintiff and appellee; argued by Larry E. Stern, Fargo.

Bruce C. Britton, Fargo, for defendant and appellant.

SAND, Justice.

This is an appeal by the defendant, Richard W. Skjonsby [hereinafter referred to as Skjonsby], from a judgment of conviction in which Skjonsby was sentenced to two concurrent life sentences as a result of a jury conviction for the murder of Michael J. Kurtz [Kurtz] and the attempted murder of Charlotte Skjonsby [Charlotte].

On 26 March 1980 at approximately 7:30 p. m., the Fargo Police Department responded to a call for assistance from the Biltmore Motor Hotel to investigate a report that gunshots had been fired in room 118 of the Biltmore. Patrolman Wayne Jorgenson was the first police officer to arrive at the Biltmore, and he observed three people in room 118. Charlotte was sitting on a luggage rack and Jorgenson observed blood on her clothing. Kurtz, the renter of room 118, was lying face down on the floor a few feet from Charlotte. Also in the room was Skjonsby. Sgt. Donald Lawyer was the next police officer at the scene, and within minutes several other law enforcement personnel arrived.

Charlotte was transferred to Dakota Hospital where surgery was performed to remove bullet fragments from her body and her wounds were dressed. Kurtz was taken to St. Luke's Hospitals, and was pronounced dead at approximately 8:30 p. m. An au-

topsy on Kurtz performed the next day determined that the cause of death was a single gunshot wound through the heart and right lung. Skjonsby was arrested at the scene and transported to the Fargo Police Department.

On 11 April 1980 and 16 April 1980 a grand jury was convened in the death of Kurtz. The grand jury subsequently indicted Skjonsby for the murder of Kurtz and the attempted murder of Charlotte.

Charlotte testified before the grand jury and described her relationship with Skjonsby as being intimate and that he had asked her several times to marry him. Charlotte testified before the grand jury that Skjonsby was a jealous man who had on occasion struck her when he had been drinking. Charlotte also described Kurtz as a close family friend who was employed as a traveling jewelry salesman and who often visited them when he was in Fargo. Charlotte testified before the grand jury as follows to the events leading up to the shooting on 26 March 1980: Charlotte, her two daughters, and Kurtz had dinner at a restaurant at West Acres in Fargo on 26 March 1980. Shortly after dinner Charlotte went to Kurtz' room at the Biltmore to view his jewelry collection. Within minutes after Charlotte arrived at Kurtz' room, there was a tiny rap on the door, followed by a louder pounding. Kurtz instructed Charlotte to go into the bathroom because he suspected someone was trying to rob his jewelry. Charlotte testified that she went into the bathroom, heard a crash and a shot, and then silence. The bathroom door was then kicked open by Skjonsby and he grabbed Charlotte, threw her into the bathtub, and began shooting her. Skjonsby then left the room and Charlotte crawled out of the bathroom and called for help. Skjonsby subsequently returned to the room and the police arrived shortly thereafter.

At trial, Charlotte testified, contrary to her grand jury testimony, that the shootings were accidental or in self-defense. Charlotte, in substance, testified that following the knock on the door, Kurtz told her to go into the bathroom and he would get his gun; that while she was in the bathroom she heard a crashing and a fight, but no gunshot; that Skjonsby then kicked open the bathroom door and was holding Kurtz' gun in his hand; that a struggle between Kurtz and Skjonsby ensued and as they struggled, the gun discharged several times, striking Charlotte; that she then fell into the bathtub and heard one more shot, and then silence; and that she crawled out of the bathtub, saw Kurtz on the floor, and called for help.

Charlotte explained the differences in her testimony by stating that she was taking painkilling drugs at the time of her grand jury testimony and could not remember what she said before the grand jury.

Skjonsby appeared as a witness at the trial and his testimony, in substance, was consistent with Charlotte's testimony at trial concerning the actual shootings. Skjonsby testified as follows: At 7:00 p. m. on 26 March 1980 he received a telephone call from Kurtz who said, "I've got Charlotte. This is Mike Kurtz. I've got Charlotte and I'm going to get even with her once and for all and I'm going to kill her." Skjonsby testified that as a result of the telephone call he went completely out of his head knowing that Charlotte would be hurt. After receiving the phone call from Kurtz, Skjonsby drove to Hornbacher's at West Acres to find Charlotte. Skjonsby did not see Charlotte's car in the parking lot and called Charlotte's store at West Acres to see if she was there. An employee at the West Acres store told Skjonsby that Charlotte was with Kurtz at the Biltmore. Skjonsby drove to the Biltmore and after learning Kurtz' room number went to room 118 and knocked on the door. After no one answered the door, he drop-kicked the window next to the door and entered room 118. A struggle with Kurtz ensued and Skjonsby hit Kurtz and slammed him into the window. As a result, Kurtz dropped his gun. Skjonsby picked up Kurtz' gun because he was afraid Kurtz would use it on him. Skjonsby then kicked open the door to the bathroom and saw Charlotte standing in the bathroom. While Skjonsby was standing in the bathroom door, Kurtz jumped him from the side and started slamming his arm against the bathroom door frame causing

the gun to discharge. The struggle continued and the gun discharged each time Kurtz slammed Skjonsby's arm against the door frame. The struggle continued in the vanity area adjacent to the bathroom and Kurtz slammed Skjonsby against the vanity counter. The gun went off as Skjonsby fell backward and hit the counter, and this shot apparently hit Kurtz. Skjonsby was momentarily knocked out and when he regained his senses he saw Charlotte lying in the corner of the bathroom. He picked her up, laid her in the bathtub, gave her a kiss, told her he loved her, picked up the gun and ran to his car. He began to drive away and then decided to go back to the room. Skjonsby also denied making any admissions or statements to the police in room 118.

The State's evidence generally supported its theory that the shootings were intentional and were not in self-defense or accidental. The State presented testimony of police officers who arrived at the scene shortly after the shooting. Sgt. Lawyer, one of them, testified that when he entered the room he exclaimed, "Who did this?" or "What has happened?" Lawyer testified that Skjonsby replied, "I did this." and that Skjonsby further stated "I went crazy. I left the room and came back. The gun is in the car." The police officers also testified that Skjonsby stated that his car was outside. The police officers testified that they obtained Skjonsby's keys from him at this time. The officers testified that Skjonsby was then placed under arrest, given the *Miranda* warning and taken to a police car in the Biltmore parking lot and from there to the police department. As Skjonsby was being led to the police car, he identified his car in the Biltmore parking lot.

The State's evidence also reflected that after Skjonsby was transported to the police department he was again read his *Miranda* rights by Capt. George Pavlicek. Pavlicek testified that he gave Skjonsby a telephone book so he could call an attorney. At this time Pavlicek testified that Skjonsby asked him, "How many times did I shoot him?"

Skjonsby subsequently made several telephone calls and in one call stated to his father, "Dad, I did something bad, very bad. I shot Charlotte and her boyfriend in a room. I'm at the Fargo police department. I think Charlotte is in the hospital. I tried to call Fred Kramer but I can't get ahold of him." Skjonsby also made another phone call and made essentially the same statements to that person, with the addition that, "I want a change of clothes brought to the Fargo police department."

A search warrant for Skjonsby's automobile was executed and a pistol and registration card were seized. Additionally, Skjonsby's apartment was searched and a gun belt and empty gun holster were recovered.

The State offered testimony of several renters of nearby rooms at the Biltmore which corroborated the police officer's testimony that Skjonsby made numerous admissions at room 118. An FBI ballistics expert testified that the bullets found in the room 118 came from the gun found in Skjonsby's automobile. The ballistics expert also testified that the murder weapon did not have a "hair" trigger which would fire with a slight touch of a finger. The ballistics expert also testified that the distance between the muzzle of the gun and the victim, when the bullet was fired, was at least five feet because no residue was found on the victim's clothing.

An FBI glass expert testified that the broken window in room 118 was broken by a high speed projectile, such as a bullet, and not by kicking the window, as testified by Skjonsby. Furthermore, the glass expert testified that the amount of glass found on Skjonsby's pants, sweater and boots was not consistent with a person kicking a piece of glass. The State also offered evidence that there were small cuts on Kurtz which were consistent with spraying glass but inconsistent with a person rolling in glass. The State also offered the testimony of Charlotte's orthopedic surgeon who testified that many of Charlotte's wounds were joined by a continuous channel, indicating that some of the wounds were caused by one bullet. This included one wound that the State asserted occurred when Charlotte

had her knee in a flexed position. This testimony directly contradicted Charlotte's and Skjonsby's trial testimony that Charlotte was shot during the struggle between Skjonsby and Kurtz while she was standing in the bathroom.

The State also called numerous impeachment witnesses who talked with Charlotte after the incident and testified that Charlotte had described the shooting in a manner essentially consistent with her grand jury testimony but not consistent with her trial testimony.

Finally, the State called Marian Mullowney a girlfriend of Charlotte's, who testified that shortly before trial Charlotte stated that "She [Charlotte] would lie through her teeth and have them [the jury] so confused when she was done that they wouldn't know which way was up."

A jury returned a verdict of guilty to the charge of the murder of Michael Kurtz and a verdict of guilty to the charge of the attempted murder of Charlotte Skjonsby. Skjonsby was subsequently sentenced to two concurrent life sentences as a result of the jury verdict and judgment of conviction, and he appealed to this Court.

While Skjonsby's appeal was pending before this Court, Charlotte pled guilty to a charge of perjury stemming from variations in her testimony before the grand jury and the jury trial of Skjonsby. Charlotte was convicted of perjury and, as a result, Skjonsby moved this Court for an order remanding his case to the trial court for the purpose of bringing a motion for a new trial based upon newly discovered evidence. The motion for remand was granted and a hearing on Skjonsby's motion for a new trial was held, after which Skjonsby's motion for a new trial was denied. Skjonsby appealed that order and requested that the two appeals be consolidated. The request was granted by this Court in an order dated 16 October 1981.

Including subissues, Skjonsby raised about thirty issues of error which we will identify in our discussion. Even though the amended Judicial Article does not require us to discuss and give reasons for every point fairly arising from the record [ (*State*

*v. Kouba,* 319 N.W.2d 161 (N.D.1982); *Nodland v. Nokota Co.,* 314 N.W.2d 89 (N.D.1981) ] we nevertheless deem it advisable to do so in this instance in order to illustrate, in part, that the quality and the reasons in support of an alleged error, rather than the quantity, control in determining if a judgment of conviction should be reversed. The United States Supreme Court, in *Engle, Correctional Superintendent v. Isaac,* 451 U.S. 906, 101 S.Ct. 1973, 68 L.Ed.2d 294, No. 80–1430 (1982), among other things, said:

> "We have long recognized, however, that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."

## JURY INSTRUCTIONS

The first main issue raised by Skjonsby is that the jury instructions given by the trial court denied him due process of the law, the right to a fair trial, equal protection of the law, and were prejudicial error.

 The first subissue raised by Skjonsby in connection with the jury instructions is that the wording of the jury instructions denied him the right to a unanimous jury verdict.

The trial judge instructed the jury, using the statutory language, that they could find Skjonsby guilty of the murder of Kurtz if the shooting "(a) was done by the defendant, Richard Skjonsby, intentionally or knowingly so as to cause the death of Michael Kurtz [NDCC § 12.1–16–01(1) ]; *or* (b) was done by the defendant, Richard Skjonsby, to cause the death of Michael Kurtz under circumstances manifesting extreme indifference to the value of human life [NDCC § 12.1–16–01(2) ]." [Emphasis added.] The trial judge further instructed the jury, using the statutory language, that they could find Skjonsby guilty of attempted murder of Charlotte if the shooting of her "(a) was done by the defendant, Richard Skjonsby, intentionally or knowingly so as to attempt to cause the death of Charlotte Skjonsby [NDCC § 12.1–16–01(1) ]; *or* (b) was done by the defendant, Richard

Skjonsby, to attempt to cause the death of Charlotte Skjonsby under circumstances manifesting extreme indifference to the value of human life [NDCC § 12.1–16–01(2) ]." [Emphasis added.]

Skjonsby asserted that by instructing the jury in the disjunctive, some members of the jury could have found him guilty of murder or attempted murder under North Dakota Century Code § 12.1–16–01(1), and some members of the jury could have found him guilty under NDCC § 12.1–16–01(2). Skjonsby's challenge to the instructions given to the jury was that by instructing the jury in the disjunctive, he was deprived of his right to a unanimous jury verdict, contrary to Article I, § 13 of the North Dakota Constitution.[1]

Skjonsby relied upon *United States v. Gipson*, 553 F.2d 453 (5th Cir. 1977), to support his position. We believe *Gipson* is distinguishable from the instant case. In *Gipson* the defendant was charged with violating a statute (18 U.S.C. 2313) that prohibited the receiving, concealing, storing, bartering, selling or disposing of a motor vehicle in interstate commerce with knowledge that the vehicle was stolen. The initial jury instruction was given in the alternative. The jury requested additional instructions from the trial judge on if they had to agree upon which of the six acts the defendant committed or if it was sufficient if they unanimously concluded he committed any of the six acts. In response to this question the trial judge specifically instructed the jury that they could find the defendant guilty if each member of the jury agreed that the defendant had done one of the six prohibited acts but there was no agreement as to which of the six prohibited acts he had committed. The jury returned a general verdict of guilty, and the Fifth Circuit Court of Appeals reversed, holding that the defendant's right to a unanimous jury verdict had been violated.

The *Gipson* court, *supra* at 457, specifically made the following comments:

"We emphasize at the outset that our examination of the propriety of the district court's instruction is not to be con-fused with an attempt to breach the shroud surrounding jury deliberation. Courts have long held that a jury verdict cannot be set aside on the grounds that it is inconsistent (*Dunn v. United States*, 1932, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356; *Odom v. United States*, 5 Cir. 1967, 377 F.2d 853, 857) or the product of a compromise (*United States v. Dotterweich*, 1943, 320 U.S. 277, 64 S.Ct. 134, 279, 88 L.Ed. 48, 50–51). But, absent competent evidence to the contrary, a court has no reason to assume that an inconsistent or compromise verdict is not unanimous, and therefore has no justification for inquiring into the logic behind the jury's verdict. The situation here is different. Gipson's non-unanimity challenge is based not on the result reached by the jury, but on a court instruction that may have judicially sanctioned a non-unanimous verdict."

In *Dunn*, one of the cases relied upon by the *Gipson* court, the jury found the defendant guilty of one count but not guilty on another related count, and in the other case, *Dotterweich*, the jury found the officer of the corporation not guilty of violating the same act. This gave rise to the unsuccessful challenge of inconsistency, but the instructions per se were not challenged.

In the instant case the challenged instructions were part of the original instructions given by the court to the jury and were not in response to a requested instruction from the jury. The alleged non-unanimity in this case is based on a possible result reached by the jury and not on a court instructions, as in *Gipson*, which sanctioned a non-unanimous verdict. Because the instruction was in the alternative does not mean the jury reached a non-unanimous verdict. The trial court specifically instructed the jury as to the essential elements of the offenses and additionally instructed the jury that the verdict must be unanimous. After the jury returned a guilty verdict to both charges the court, at the defendant's request, polled the jury and they all indicated the verdicts were unanimous. The record contains no evidence that the jury reached a non-unani-

1. See also Rule 31(a), North Dakota Rules of Criminal Procedure.

mous verdict and from the record we have no reason to assume the verdict was not unanimous, thus no justification exists for inquiring into the logic behind the jury verdict. See, *United States v. Pavloski*, 574 F.2d 933 (7th Cir. 1978); *United States v. Bolts*, 558 F.2d 316 (5th Cir. 1977), *cert. denied* 439 U.S. 898, 99 S.Ct. 262, 58 L.Ed.2d 245 (1978); *People v. Taggart*, 621 P.2d 1375 (Colo.1981); *State v. Utter*, 92 N.M. 83, 582 P.2d 1296 (C.A.1978).

Skjonsby contended that he was denied the right to a fair trial because of misleading jury instructions on the culpability requirements.

Skjonsby asserted that because the court did not specifically instruct the jury that the culpability requirement for murder or attempted murder under NDCC § 12.1–16–01(2) was "willfully", and because the court defined the term "negligently" in its definitions of conduct, the jurors were misled by the instructions to believe that murder or attempted murder under NDCC § 12.1–16–01(2) could be accomplished if he acted negligently.

█ Jury instructions should not mislead or confuse the jury and must fairly inform the jury of the law that must be applied. *State v. Tipler*, 316 N.W.2d 97 (N.D.1982). It is well settled that jury instructions must be considered as a whole in determining if the particular instruction is misleading and if, when considered as a whole, the instruction correctly advises the jury of the law it is sufficient although part of the instruction standing alone is insufficient or erroneous. *State v. Tipler, supra; State v. Hepper*, 316 N.W.2d 338 (N.D. 1982); *State v. Granrud*, 301 N.W.2d 398 (N.D.1981), *cert. denied* —— U.S. ——, 102 S.Ct. 113, 70 L.Ed.2d 98 (1981); *State v. Reich*, 298 N.W.2d 468 (N.D.1980); *State v. Kroeplin*, 266 N.W.2d 537 (N.D. 1978).

█ In this instance the amended indictment (see fn. 18, *infra* ) was read as part of the instructions to the jury. The indictment charge that Skjonsby *willfully* caused the death of Kurtz under circumstances manifesting extreme indifference to the value of human life and that Skjonsby *willfully* attempted to cause the death of Charlotte under circumstances manifesting extreme indifference to the value of human life. The instructions also informed the jury that before they could find Skjonsby guilty, the State must prove each and every element in the *indictment* to be true. We believe these instructions, when read as a whole, are sufficient even though a separate part of an instruction may have been incomplete.

We also note that the only time the term "negligently" was used in the instructions was in a list of definitions of conduct or culpability. This list also included "intentionally," "knowingly," "recklessly," and "willfully." The definition of "willfully" does not include "negligently," and we do not believe the inclusion of the term "negligently" in the definitions of conduct could mislead the jury to believe that murder or attempted murder could be accomplished by acting "negligently."

The next issue raised by Skjonsby is that he was denied the right to a fair trial because the trial court refused to give North Dakota Pattern Jury Instruction 1308 on equivocation. North Dakota Pattern Jury Instruction 1308 provides in substance that in cases where the evidence would admit of two constructions or interpretations, each of which appears reasonable and one of which points to the guilt of the defendant while the other points to his innocence, the jury must adopt the interpretation which will admit the defendant's innocence and reject that which points to his guilt.[2]

2. Pattern Jury Instruction 1308 provides as follows:

### "EQUIVOCATION

"If the evidence in this case will admit of two constructions or interpretations, each of which appears to you to be reasonable, one of which points to the guilt of the Defendant and the other to his innocence, you must adopt the interpretation which will admit of the Defendant's innocence and reject that which points to his guilt.

"This rule applies only when both of the two possible opposing conclusions appear to you to be reasonable. If, on the other hand, one of two possible conclusions appears to

■ Initially we note that North Dakota pattern jury instructions are suggested instructions only. *State v. Dachtler*, 318 N.W.2d 769 (N.D.1982); *State v. Jacob*, 222 N.W.2d 586 (N.D.1974). A trial court is not required to submit instructions in the specific language requested by the defendant. *State v. Dachtler, supra; State v. Tipler, supra; State v. Sheldon*, 301 N.W.2d 604 (N.D.1980), *cert. denied* 450 U.S. 1002, 101 S.Ct. 1711, 68 L.Ed.2d 204 (1981).

■ In this instance the jury was instructed, among other things, on the presumption of innocence and burden of proof, the weight and credibility of evidence, the use of impeachment evidence, the definition of reasonable doubt, the excuse for the commission of an act, the elements of the alleged offense, and the use of self defense. In *State v. Johnson*, 231 N.W.2d 180 (N.D. 1975), instructions similar to those given in the instant case were given and this Court concluded it was not necessary to give the requested equivocation instruction because the facts in evidence were sufficiently and properly covered by other instructions. Similarly, in view of the instructions given in this case, we do not believe it was error for the trial court to refuse to give the requested instruction on equivocation.

Skjonsby also contended that he was denied a fair trial because the trial court failed to instruct the jury on duress. He asserted that evidence was presented at trial to warrant an instruction on duress pursuant to NDCC § 12.1–05–10.[3]

■ Although the trial court is not required to submit instructions in the specific language requested by a defendant, the defendant is entitled to an instruction based on a legal defense if there is evidence to support it. *State v. Gann*, 244 N.W.2d 746 (N.D.1976).

■ In particular, Skjonsby points to the following testimony given by him during direct examination which he asserted established that he was under duress at the time of the death of Kurtz:

"Q What happened then?

"A I took the receiver and I said, 'Hello.'

"Q What happened then?

"A Then the guy said, 'I've got Charlotte.'

"Q What did you respond?

"A I said, 'Who is this?'

"Q What did he say?

"A He said, 'This is Mike Kurtz.'

"Q What did you say?

"A I said, 'What?' He said, 'I've got Charlotte and I'm going to get even with her once and for all and I'm going to kill her.' And I said, 'What?' And he hung up.

"Q What did you think at that time?

"A I went absolutely out of my mind.

"Q At that time, approximately 7:00 p. m. on March 26, 1980, what did you know of Michael Kurtz?

"A I knew that Michael Kurtz was dangerous. He was a psychopathic nut.

you to be reasonable and the other to be unreasonable, you must adhere to the reasonable deduction and reject the unreasonable, bearing in mind, however, that even if the reasonable deduction points to the Defendant's guilt, you must otherwise be satisfied of the Defendant's guilt beyond a reasonable doubt before you can find the Defendant guilty."

**3.** Skjonsby requested the following jury instruction on duress:

"Members of the Jury, you are instructed that in a prosecution for any offense, it is an affirmative defense that the actor engaged in the proscribed conduct because he was compelled to do so by threat of imminent death or serious bodily injury to himself or to an-

other. Compulsion within the meaning of the law relating to actions due to duress exist only if the force, threat, or circumstances are such as would render a person of reasonable firmness incapable of resisting the pressure. The Defendant has the burden of proving the affirmative defense of duress set forth herein by a preponderance of the evidence which means the Defendant must establish the affirmative defense of duress to rely thereon by the greater weight of the evidence. Evidence is of greater weight if, when considered and compared with that opposed to it, it is more persuasive and convinces you what a party seeks to prove is more likely true than not true. It is immaterial who produced the persuasive evidence."

"Q Why?

"A Michael Kurtz was responsible for the death of Lynn Skjonsby [Charlotte's deceased husband].

. . . . .

"Q What else did you know of Michael Kurtz?

"A She [Charlotte] also told me that he was responsible for breaking her garage and damaging the property and stealing goods, that he was a blackmailer.

"Q In what way?

"A He was trying to blackmail her into marriage or a sexual relationship."

In this instance the jury was instructed, in part, as follows concerning excuse:

"The laws of this state with respect to excuse for the commission of acts which constitute a crime so far as applicable to this case provide:

"'A person's conduct is excused if he believes that the facts are such that his conduct is necessary and appropriate for any of the purposes which would establish a justification or excuse under this chapter, even though his belief is mistaken.'

"You are instructed that in connection with the defendant's claim of excuse for his conduct relating to the defendant's shooting of Michael Kurtz and Charlotte Skjonsby, the defendant must then have truly believed that Charlotte Skjonsby's life was in imminent danger while she was at the Biltmore Motor Inn in the company of Michael Kurtz and that the defendant then truly believed that such conduct as he committed was necessary and appropriate for the purposes of establishing the defense of Charlotte Skjonsby under such circumstances; or were truly believed by him to have been necessary and appropriate to establish the defendant's own self-defense in the premises. Such beliefs would support a valid excuse for the commission of a crime charged even though such belief is mistaken."

The instructions went on to provide that the State had the burden of proof as to the nonexistence of excuse. Further, the jury was also instructed as to self-defense and the defense of others.

We believe the court's instructions on self-defense, defense of others, and excuse correctly and adequately instructed the jury as to the earlier set out factual situation reflected by the testimony of Skjonsby. The instruction given by the court was more favorable to Skjonsby than the instruction he requested. Pursuant to the court's instruction, Skjonsby was excused even if he had a mistaken belief that Charlotte's life was in imminent danger, and pursuant to Skjonsby's requested instruction (see fn. 3) he was absolved from liability if his compulsion to act was such that a person of reasonable firmness would be incapable of resisting the pressure. The court's instruction also placed the burden of proof of the nonexistence of excuse on the State, and the Skjonsby's requested instruction placed the burden of proof upon him. We do not believe the trial court erred in refusing to give the specific instruction on duress in the language requested by Skjonsby.

Next Skjonsby contended that the trial court denied him due process of law, equal protection of the law, and committed prejudicial error in failing to instruct the jury as to lesser included offenses.

Skjonsby requested instructions to the offenses of manslaughter and negligent homicide with respect to Kurtz' death and aggravated assault with respect to the shooting of Charlotte. The requested instructions were refused.

■ There is no constitutional right guaranteeing a defendant a jury instruction on a lesser included offense in every case. *Keeble v. United States*, 412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973); *State v. Piper*, 261 N.W.2d 650 (N.D.1977).

■ The following two-part test must be met in order to submit an instruction on a lesser included offense to the jury:

"... the instruction must include an offense which is a lesser included offense to the offense charged; and the lesser included offense instruction can only be

given if evidence exists which will create a reasonable doubt as to the greater offense and the evidence will support beyond a reasonable doubt a conviction of the lesser included offense." *State v. Sheldon,* 301 N.W.2d 604, 609.

See also, *State v. Trieb,* 315 N.W.2d 649 (N.D.1982); *State v. Houser,* 261 N.W.2d 382 (N.D.1977); *State v. Piper, supra.*

Skjonsby asserted that with respect to the charge of the murder of Kurtz it was absolutely necessary and always proper for the trial court to instruct the jury on manslaughter [4] and negligent homicide [5] because it is impossible to commit murder without committing manslaughter or negligent homicide. Skjonsby further asserted that with respect to the charge of attempted murder of Charlotte it is absolutely necessary to instruct the jury on aggravated assault [6] because it is impossible to commit attempted murder without committing aggravated assault.

Skjonsby's argument in this respect overlooks the proposition that there must be evidence introduced which will create a reasonable doubt as to the greater offense and support the conviction of a lesser offense beyond a reasonable doubt. In *State v. Piper, supra* at 654 we addressed a similar argument and stated:

"We are not persuaded by defendant's eloquent argument which in effect would require giving the lesser included offense of sexual assault instructions in every charge of sexual imposition or attempted sexual imposition. We are not satisfied that justice will be done if instructions on the lesser included offense are given re-gardless of the evidence because it may well lead the jury to a compromise decision, which is not compatible with the function of the jury in a criminal case.

"The Supreme Court of the State of Wisconsin, in *Hughes v. State,* 55 Wis.2d 477, 198 N.W.2d 348, 350 (1970), stated:

'The early cases point out and emphasize and we must stress again, because the question keeps recurring, that a determination of whether an instruction on a lesser included crime should be given to a jury is not solved by merely determining the crime charged includes the lesser offense because juries are not to be given the discretion or freedom to pick and choose what offense the accused should be found guilty of. [Citation omitted.] The evidence must throw doubt upon the greater offense. Juries cannot rightly convict of the lesser offense merely from sympathy or for the purpose of reaching an agreement. They are bound by the evidence and should be limited to those included crimes which a reasonable view of the evidence will sustain and does not convince beyond a reasonable doubt the additional element of the greater crime existed.' [*State v. Melvin,* 49 Wis.2d 246, 253, 181 N.W.2d 490, 494 (1970).]"

See also, *State v. Houser, supra.*

■ Skjonsby asserted that evidence existed which created a reasonable doubt as to the greater offense and therefore requires an instruction as to the lesser included offenses. Skjonsby asserted that physical ev-

4. NDCC § 12.1–16–02 deals with manslaughter, and provides as follows:
 "A person is guilty of manslaughter, a class B felony, if he:
 "1. recklessly causes the death of another human being;"
 "2. Causes the death of another human being under circumstances which would be murder, except that he causes the death under the influence of extreme emotional disturbance for which there is reasonable excuse. The reasonableness of the excuse shall be determined from the viewpoint of a person in his situation under the circumstances as he believes them to be. An emotional disturbance is excusable, within the meaning of this subsection, if it is occasioned by any provocation, event, or situation for which the offender was not culpably responsible."

5. NDCC § 12.1–16–03 deals with negligent homicide, and provides as follows:
 "A person is guilty of a class C felony if he negligently causes the death of another human being."

6. NDCC § 12.1–17–02(4) deals with aggravated assault, and provides as follows:
 "A person is guilty of a class C felony if he:
 "4. Fires a firearm or hurls a destructive device at another human being."

idence created a reasonable doubt as to the commission of the greater offense;[7] that both Charlotte and Skjonsby described the shootings as "accidental"; and that the trial court believed that the evidence was sufficient to warrant an instruction on self-defense and defense of others, and if the evidence was such that an instruction on self-defense or defense of others was warranted, the same evidence mandated an instruction on the lesser included offenses to murder.[8]

We do not believe the trial court erred in refusing to instruct the jury as to lesser included offenses. Throughout the trial it was clear the prosecution's theory of the case was that the shootings were intentional. The direct and circumstantial evidence offered by the State supported its position.

If Skjonsby's testimony and theory of the case are believed, the evidence would not support murder or attempted murder, beyond a reasonable doubt. Skjonsby's and Charlotte's testimony, if believed, would not require an instruction as to a lesser included offense because that testimony supports acquittal of the charges and that same testimony would not consistently support conviction of a lesser included offense. Assuming Skjonsby's evidence created a reasonable doubt as to murder and attempted murder, because the evidence established self-defense or accident, that same evidence relied upon by Skjonsby to create a reasonable doubt as to murder and attempted murder would create a reasonable doubt as to any lesser included offenses. Skjonsby's and Charlotte's testimony that the shoot-ings were in self-defense or an accident is a total denial of criminal intent or culpability and is not a mitigating factor to reduce culpability so as to require an instruction on lesser included offenses. Skjonsby's evidence concerning the sequence of events in the room 118 and the State's evidence and theory of the actual shooting are so contrary that it would be an irrational conclusion for a partial acceptance and partial rejection of Skjonsby's evidence and a partial acceptance and a partial rejection of the State's case on these particular events. We are not suggesting that a jury may not reconcile evidence presented and believe a witness in whole or in part. We believe, however, that the evidence presented as to the actual shootings are so diverse that such a reconciliation would encourage a compromise verdict.

Skjonsby also cited our recent decision in *State v. Trieb, supra,* to support his position that pursuant to NDCC § 12.1–16–02(2) an instruction should have been given on voluntary manslaughter because of "extreme emotional disturbance."

In *State v. Trieb, supra* at 658 we said that voluntary manslaughter has two principle components:

"(1) the particular defendant must have 'acted under the influence of extreme emotional disturbance' and (2) there must have been a 'reasonable explanation or excuse' for the emotional disturbance."

In discussing whether or not Trieb acted under "extreme emotional disturbance" we noted that the term was defined by one court [*People v. Shelton,* 88 Misc.2d 136, 385 N.Y.S.2d 708 (1976)[9]] as the emotional state of an individual who:

---

7. In particular Skjonsby pointed to evidence which reflected that the bullet that killed Kurtz entered the left front of the chest about two inches left of the left nipple and exited at the right back area. Skjonsby asserted that this physical evidence revealed that the gun might not have been directly aimed at the heart, but rather, eventually passed through the heart. As further support Skjonsby pointed out that Charlotte was shot in non-vital areas.

8. In this respect Skjonsby asserted that NDCC § 12.1–05–08 codifies an "imperfect self-defense" which may reduce murder to manslaughter or negligent homicide and attempted murder to a lesser offense. See *State v. Swift,* 53 N.D. 916, 208 N.W. 388 (1926).

9. In *State v. Shelton, supra* at 710, the following statement was made:

"As with most cases where this defense may be properly asserted, the issue presented is a very close one since all intentional homicides with the exception of those by cold-blooded killers or in the course of a felony, are abnormal acts for the perpetrators and the result of strong emotions and stresses. Consequently, a distinction must be drawn so that this defense will only be applicable to those homicides which appropriately qualify under the underlying purpose of this mitigating defense and not *en masse* to all acts constituting murder, in the second degree."

"... (a) has no mental disease that rises to the level of insanity; (b) is exposed to an extremely unusual and overwhelming stress; and (c) has an extreme emotional reaction to it, as a result of which there is a loss of self-control and reason is overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation, or other similar emotions." *State v. Trieb, supra* at 659.

Skjonsby asserted that the following are some of the factors present in his case which establish "extreme emotional disturbance": (1) failing businesses and several lawsuits concerning those businesses; (2) problems with his relationship with Charlotte; (3) putting his grandmother in a nursing home; (4) telephone call from Kurtz and Skjonsby's knowledge about Kurtz; and (5) his fear that Charlotte was in trouble.

In view of Skjonsby's actions following the telephone call and before going to the Biltmore, and the given reason for going to the Biltmore, we do not believe the evidence relied upon by Skjonsby established that he was entitled to an instruction on voluntary manslaughter because of an "extreme emotional disturbance."

■ The next issue raised by Skjonsby was that the trial court denied him a fair trial in failing to instruct the jury on the effect of the statutory presumption of innocence. Skjonsby asserted that pursuant to NDCC § 12.1–01–03(4)(b)[10] the trial court is required to instruct the jury that the presumed fact of innocence is *strong* evidence of the fact presumed.

In this instance the court instructed the jury pursuant to North Dakota Pattern Jury Instruction 1201 which provides, in part, as follows:

"The Defendant is presumed to be innocent until the contrary, his guilt, is proved to your satisfaction beyond a reasonable doubt. If you have a reasonable doubt as to whether the guilt of the Defendant has been so proven, he is entitled to be acquitted."

Skjonsby failed to request an instruction to the effect that the presumption of innocence is *strong* evidence of the fact presumed, and in fact North Dakota Pattern Jury Instruction 1201 is the same instruction requested by Skjonsby.

We also note that NDCC § 12.1–01–03(4) deals with the consequences of a presumption at a criminal trial. We do not believe that section requires an instruction that a presumption is *strong* evidence of the fact presumed.

■ Skjonsby contended that the trial court's instructions on self-defense and defense of others denied him a fair trial.

In particular, Skjonsby asserted that the trial court erred when it failed to include language found in NDCC § 12.1–05–03(2)(b)[11] which reads:

"A person's use of defensive force after he withdraws from an encounter and indicates to the other person that he has done so is justified if the latter nevertheless continues or menaces unlawful action."

Skjonsby asserted that with the absence of the above-quoted language, if the jury

**10.** North Dakota Century Code § 12.1–01–03(4)(b) provides as follows:

"In submitting the issue of the existence of the presumed fact to a jury, the court shall charge that, although the evidence as a whole must establish the presumed fact beyond a reasonable doubt, the jury may arrive at that judgment on the basis of the presumption alone, since the law regards the facts giving rise to the presumption as strong evidence of the fact presumed."

**11.** NDCC § 12.1–05–03 provides in part as follows:

"*Self-defense.*—A person is justified in using force upon another person to defend himself against danger of imminent unlawful bodily injury, sexual assault, or detention by such other person, except that:

2. A person is not justified in using force if:

a. He intentionally provokes unlawful action by another person to cause bodily injury or death to such other person; or

b. He has entered into a mutual combat with another person or is the initial aggressor unless he is resisting force which is clearly excessive in the circumstances. A person's use of defensive force after he withdraws from an encounter and indicates to the other person that he has done so is justified if the latter nevertheless continues or menaces unlawful action."

believed he was the initial aggressor, he would never be able to rely on self-defense. Further, Skjonsby asserted that there was evidence to establish that he withdrew from the encounter and indicated to Kurtz that he had done so and that later Kurtz continued unlawful action.

In this instance we do not believe the trial court erred in failing to instruct the jury as to the above-quoted portion of the statute. The evidence presented by Skjonsby at trial established that he went to Kurtz' room to protect Charlotte after he received a threatening phone call and, that when he entered the room to protect her, he was confronted by Kurtz with a gun. This evidence establishes that Kurtz was the initial aggressor in making threats and holding a gun on Skjonsby.

Pursuant to the State's evidence, Skjonsby went to Kurtz' room with a gun and there was no evidence of a withdrawal by Skjonsby. [See earlier discussion concerning lesser included offenses for conflicting versions of shooting.] Based on the diametrically opposed versions of the actual shootings, we do not believe the trial court erred by not including the above-quoted sentence of the statute in the instruction.

■ Skjonsby also asserted that the trial court's instructions created the impression that he had to affirmatively bring forth evidence to establish self-defense and thus shifted the burden of proof to him. In particular, Skjonsby pointed to the following sentences which he asserted were misleading to the jury regarding the burden of proof to establish self-defense:

"The defendant through his counsel and evidence offered at trial has asserted that his acts in causing the death of Michael Kurtz were acts of self-defense or acts committed in the defense of Charlotte Skjonsby."

. . . . .

"You are further instructed that the defendant has not offered any evidence upon which a claim could be based that he acted in this instance in self-defense against any act of Charlotte Skjonsby. Therefore, you are not to consider any such claim of self-defense with respect to the charge of Attempted Murder of Charlotte Skjonsby, except as you may find to have occurred incident to the defendant's claimed defense of self-defense in respect to the charge of Murder of Michael Kurtz."

We must keep in mind that jury instructions are to be read as a whole to determine whether or not they correctly and adequately advise the jury of the law. In this instance we note that the instructions of the essential elements of the offense given by the trial court provided as follows:

"No person may be convicted of an offense unless, in accordance with these instructions, each element of the offense is proved beyond a reasonable doubt.

"The essential elements of the offense of murder as charged in this case, are as follows:

. . . . .

"3. That the acts of Richard Skjonsby, in causing the death of Michael Kurtz, were not acts of self-defense nor acts committed in the defense of Charlotte Skjonsby.

"If the State has failed to prove any one of these essential elements of the offense of Murder beyond a reasonable doubt, the State has failed to meet its burden of proof as to the charge of Murder of Michael Kurtz.

. . . . .

"The essential elements of the offense of attempted murder as charged in this case are as follows:

. . . . .

"4. That the acts of Richard Skjonsby, in attempting to cause the death of Charlotte Skjonsby, were not acts of self-defense nor acts committed in the defense of Charlotte Skjonsby.

"If the State has failed to prove any one of these essential elements of the offense of Attempted Murder beyond a reasonable doubt, the State has failed to meet its burden of proof as to the charge of Attempted Murder of Charlotte Skjonsby."

The jury was also instructed that "the State must prove each and every essential

element of the offenses stated in the indictment to be true to your satisfaction beyond a reasonable doubt."

We do not believe the instructions, when read as a whole, and, in particular the above set out instructions, were misleading to the jury as to the burden of proof.

■ Skjonsby also asserted that the instructions on self-defense were prejudicial to him because the jury was instructed that Kurtz had the right to assert the same acts of self-defense and defense of others as were claimed by Skjonsby. Skjonsby therefore asserted that the instructions wrongfully allowed the jury to focus upon the acts of Kurtz. We do not believe the instructions were erroneous because of these words, and, at most, the inclusion of these words were surplusage.

■ The next error asserted by Skjonsby is that the inclusion of the words "so as to" in the essential elements of the offenses misled the jury. The trial court instructed the jury that part of the essential elements of the murder of Kurtz was "that at such time and place such shooting of Michael Kurtz: (a) was done by the defendant, Richard Skjonsby, intentionally or knowingly *so as to* cause the death of Michael Kurtz." [Emphasis added.] The trial court also instructed the jury that part of the essential elements of the offense of attempted murder of Charlotte Skjonsby was "that at such time and place such shooting of Charlotte Skjonsby: (a) was done by the defendant, Richard Skjonsby, intentionally or knowingly *so as to* attempt to cause the

death of Charlotte Skjonsby." [Emphasis added.]

Skjonsby asserted that including these words in the instructions separated the culpability requirements from the conduct so that the words "knowingly" or "intentionally" no longer modified the cause of death of Kurtz or the attempt to cause the death of Charlotte claimed this was prejudicial because the jury may have believed that the gun was fired knowingly but that the death was accidental or that there was no known attempt of murder.

We believe Skjonsby's argument must fail because in both instances the phrase was prefaced by the term "that at such time and place such shooting of Michael Kurtz [or Charlotte Skjonsby] was done by the defendant, Richard Skjonsby, intentionally or knowingly." The complete sentence and not the isolated phrase must be examined, and when examined, we believe Skjonsby's contention that the court committed error is meritless.

■ Next Skjonsby contended that the trial court denied him a fair trial and committed prejudicial error when it failed to give requested North Dakota Jury Instruction 1305 [*sic* 1304].[12] Skjonsby asserted that the failure to give this instruction took from the jury the factual question of whether or not certain statements or admissions were made by him, and if those statements or admissions were made by him, whether or not they were voluntary.

The following instruction concerning oral admissions was given to the jury:

**12.** Skjonsby's brief cited Jury Instruction 1305; however, the correct cite apparently is to instruction 1304, which provides as follows:

"STATEMENTS, CONFESSIONS AND ADMISSIONS

"Testimony has been received in this case concerning certain statements made by the Defendant out of Court and before trial as to his involvement in the commission of the crime charged. A statement by the Defendant acknowledging all of the material facts constituting the crime charged is a 'confession'. A statement by the Defendant implicating him in the crime charged but not involving an acknowledgment of all of the material facts constituting the crime charged is an 'admission'.

"Any incriminating statement, whether a confession or an admission, made by any person charged with crime in a court of this state, which was obtained by duress, fraud, threat, or promise, is not admissible in evidence against him in a criminal action. Accordingly, you must not consider such testimony as evidence of guilt of the crime charged, unless you are convinced beyond a reasonable doubt that the statement made by the Defendant was made freely and voluntarily.

"In determining whether a statement made by the Defendant was made freely and voluntarily, you should consider all of the evidence in the case regarding the circumstances under which the statement was made."

## "ORAL ADMISSION VIEWED WITH CAUTION

"Evidence as to an oral admission claimed to have been made outside of court by a party to a case should be considered with caution and weighed with great care before using it against him. The person relating the claimed admission may have been mistaken, or may have misunderstood, or may have misquoted the declarant, or may not have expressed clearly the meaning intended.

"If, however, an oral admission made outside of court is proved by credible evidence, you may treat it as trustworthy and consider it along with other evidence in the case."

Our review of the record leads us to conclude that the voluntariness of statements made by Skjonsby was not an issue. The dispute concerning the statements was whether or not Skjonsby made the statements and the jury was adequately instructed on this issue. Skjonsby asserted that no statements were made by him in room 118 The State presented evidence to the effect that when the first two police officers entered room 118, one of them exclaimed, "Who did this?" or "What has happened?" and that Skjonsby responded by stating in words to the effect, "I did this. I went crazy. I left the room and came back. The gun is in the car." The statements resulted from general on-the-scene investigation and were not the result of a "custodial interrogation." [13] The record does not reflect that duress, fraud, threat, or promise was a procuring factor in any of these statements. Similarly, the statement made to Detective Pavlicek at the police station was volunteered and the record does not reflect that duress, fraud, threat or promise was a procuring factor. Further, any statements made by Skjonsby to identify his car in the Biltmore parking lot were either volunteered by him or were only for identification purposes and were not confessions or admissions.

Because the statements made by Skjonsby were unsolicited and volunteered and because there is no evidence of duress, fraud, or threats, we do not believe the trial court erred in refusing to give the instruction requested by Skjonsby.

## PRETRIAL PROCEDURE

The next main point raised by Skjonsby is that the trial court made several pretrial errors which denied him certain constitutional rights and were prejudicial error that was not harmless.

The first of the alleged pretrial errors raised by Skjonsby is that the trial court committed prejudicial error when it failed to dismiss the indictments upon his motion. Skjonsby asserted that the trial court should have dismissed both indictments against him because the grand jury failed to follow certain statutory guidelines.

■ In particular, Skjonsby asserted that NDCC § 29–10.1–26(2) [14] was violated because the grand jury received evidence which would not have been admissible over objection at trial in a criminal action. We believe Skjonsby's assertion in this respect is meritless because the last phrase of § 29–10.1–26(2) specifically provides "the fact the evidence inadmissible at trial was received by the grand jury does not render the indictment void if sufficient competent evidence to support the indictment was received by the grand jury."

■ In connection with whether or not there was sufficient competent evidence to support an indictment, Skjonsby asserted that NDCC § 29–10.1–33 [15] sets forth a duty upon the grand jury not to indict unless there is proof beyond a reasonable

13. See discussion of suppression issue, *infra.*

14. NDCC § 29–10.1–26(2), provides as follows:
"The grand jury shall receive only evidence that would be admissible over objection at the trial of a criminal action, but the fact the evidence inadmissible at the trial was received by the grand jury does not render the indictment void if sufficient competent evi-

dence to support the indictment was received by the grand jury."

15. NDCC § 29–10.1–33 provides as follows:
"The grand jurors shall find an indictment charging a person with the commission of an offense when all the evidence before them, taken together, is such as in their judgment would warrant a conviction by the trial jury."

doubt, and that, in this instance, the grand jury indicted without the necessary quantum of proof.

However, this contention was resolved recently in *State v. Nordquist,* 309 N.W.2d 109, 117 (N.D.1981), where we said:

"We believe that language [NDCC § 29–10.1–33] reflects the Legislature's intent to allow the grand jury to determine whether or not the evidence put before it pursuant to Section 29–10.1–26 is satisfactory for the purpose of directing, in good faith, an accusation toward the person who is the subject of the indictment and which, in the jurors' minds, could withstand the test of a trial.... Thus the grand jury's function is to determine whether or not an accusation, not a conviction, is warranted."

Furthermore, our review of the grand jury transcript reflects that there was sufficient competent evidence to indict Skjonsby.[16]

Skjonsby also asserted that the grand jury violated NDCC § 29–10.1–27 [17] because it failed to order exculpatory evidence produced. He asserted that certain testimony before the grand jury raised the possibility of his diminished capacity because of mental disease or defect and, in addition, that the grand jury failed to question Charlotte as to why certain physical evidence did not match her grand jury testimony.

 We do not believe the grand jury has a duty to pursue or exhaust every possible defense which may be available to a defendant if, in fact, his case ultimately goes to trial. In this respect we do not believe that exculpatory evidence includes anything which might work in favor of or benefit the defendant in his defense at trial. Rather, we believe that the exculpatory evidence referred to in this section is evidence which would preclude issuing an indictment.

 We believe that Skjonsby's argument as to mental disease or defect is tenuous at best because no insanity defense was ever urged at trial and, in fact, the record reflects that prior to trial he withdrew a notice of intent to rely upon the defense of lack of criminal responsibility by reason of mental disease or defect. Skjonsby is now in a poor position to assert that the grand jury should have inquired further into a possible defense which he in fact did not raise at trial. Further, we also do not believe that the grand jury violated its duty by failing to inquire further of Charlotte as to the alleged inconsistencies of her testimony with the physical evidence.

 The next pretrial issue raised by Skjonsby is that the trial court committed prejudicial error in allowing the indictments to be amended. Initially, Skjonsby was charged with three counts of murder and three counts of attempted murder. The trial court allowed the State to amend the indictment to charge one count of murder in three alternative ways, and one count of attempted murder in three alternative ways.[18]

---

**16.** We note that in *State v. Nordquist, supra* at 116 we also held that the proper procedure to challenge a court order denying a motion to dismiss an indictment for lack of sufficient competent evidence was by application to this Court for a writ of certiorari.

**17.** NDCC § 29–10.1–27 provides as follows:

"The grand jury shall weigh all the evidence submitted to it, and when it has reason to believe that there is exculpatory evidence within its reach, it shall order the evidence to be produced, and for that purpose may require the state's attorney or prosecutor to issue process for the production of such evidence."

**18.** The original indictment provided as follows:

"On or about March 26, 1980 at Fargo in Cass County, the above Defendant [Richard W. Skjonsby] committed the offenses of: Murder (3 counts) and attempted murder (3 counts) in violation of Sections 12.1–06–01 and 12.1–16–01 of the North Dakota Century Code, by then and there:

"*Count 1:* the defendant intentionally or knowingly caused the death of another human being, to-wit: caused the death of Michael J. Kurtz;

"*Count 2:* the defendant willfully caused the death of another human being under circumstances manifesting extreme indifference to the value of human life, to-wit: caused the death of Michael J. Kurtz under circumstances manifesting extreme indifference to the value of human life;

"*Count 3:* the defendant willfully committed or attempted to commit burglary or felonious restraint in the course of and in furtherance of such crime or of immediate flight there-

Skjonsby asserted that an indictment cannot be amended except by the grand jury. See 8 Moore's Federal Practice Criminal Rules ¶ 7.05. However, that same source also states that it is clear that the indictment may be amended as to matters of form. See also, *Russell v. United States*, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *United States v. Radetsky*, 535 F.2d 556 (10th Cir. 1976), *cert. denied* 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976); *United States v. Dawson*, 516 F.2d 796 (9th Cir. 1975), *cert. denied* 423 U.S. 855, 96 S.Ct. 104, 46 L.Ed.2d 80 (1975).

The record reflects that Skjonsby made a motion to require the State to elect which of the original six counts on which it wished to proceed and, as a result of that motion, the court allowed consolidation of the charges into two counts. A review of those two counts reveals that they are exactly the same wording as the original counts and do not change the substance of the charges. Rather, they go to the form in which the charges were levied against Skjonsby. Based on this we conclude that the amendments were as to matters of form and the district court did not err in allowing the indictment to be amended to state one count of murder in three alternative ways, and one count of attempted murder in three alternative ways.

The next pretrial issue raised by Skjonsby is that the trial court erred by failing to dismiss the defective indictment, and instead allowed the filing of a bill of particulars. He asserted that the indictment was defective and that a bill of particulars cannot save a defective indictment. See 8

Moore's Federal Practice Criminal Rules ¶ 7.06.

Rule 7(c), North Dakota Rules of Criminal Procedure, sets out the nature and contents of an indictment and provides in part as follows:

"The indictment or the information shall name or otherwise identify the defendant, and shall be a plain, concise, and definite written statement of the essential facts constituting the offense charged."

■ Two functions of an indictment are to apprise the defendant of the charge of which he is accused and to allow the defendant to plead his acquittal or conviction as a bar in any subsequent prosecution for the same offense. *Russell v. United States, supra.*

■ The charges in the amended indictment essentially track the language of the pertinent statute defining the alleged crime. [See n. 18.] The amended indictment also recites that the defendant committed the offenses on 26 March 1980, at Fargo, in Cass County, and that he caused the death of Michael J. Kurtz, and that he attempted to cause the death of Charlotte Skjonsby. Although the amended indictment does not contain a detailed factual description of how the alleged offenses were committed, we believe the factual description contained in the amended indictment does set forth a plain, concise, and definite written statement of the essential facts constituting the offense charged and serves the functions of an indictment, and we conclude that the amended indictment was not defective. Accordingly, we do not

from he caused the death of any person, to-wit: caused the death of Michael J. Kurtz;
"*Count 4*: the defendant intentionally or knowingly attempted to cause the death of another human being, to-wit: attempted to cause the death of Charlotte Skjonsby;
"*Count 5*: the defendant attempted to willfully cause the death of another human being under circumstances manifesting extreme indifference to the value of human life, to-wit: attempted to cause the death of Charlotte Skjonsby under circumstances manifesting extreme indifference to the value of human life;

"*Count 6*: the defendant willfully committed or attempted to commit burglary or felonious restraint and in the course of and in furtherance of such crime or of immediate flight therefrom he attempted to cause the death of any person, to-wit: attempted to cause the death of Charlotte Skjonsby."
The amended indictment changed count 1 to count 1(a); count 2 to count 1(b), count 3 to count 1(c); count 4 to count 2(a), count 5 to count 2(b) and count 6 to count 2(c).

believe the trial court erred by failing to dismiss the indictment nor did it err by allowing a bill of particulars to be filed.

We also note that the prosecution stated in its brief that it had an "open file policy" in the case and supplied the defendant with all police reports pertaining to the case. Skjonsby asserted, however, that the prosecution did not have an open file policy in this case and that the State was selective in supplying him with information. In particular, Skjonsby asserted that the prosecution neglected to provide him vital information as to the statement of Marian Mullowney concerning Charlotte's testimony or the reason that the State took the grand jury testimony of Charlotte in the first place.

■ The record reflects that the prosecution, in several instances, provided copies of police reports and other material in their file to the defendant. We do not believe the State has an obligation to disclose its manner of proof of each and every element of its case to the defendant.

■ In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that the prosecution could not withhold evidence favorable to an accused, if the accused had requested it, without violating due process, nor could the prosecution withhold evidence if the evidence is material to guilt or to punishment. See also, *Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), *rehearing denied* 409 U.S. 897, 93 S.Ct. 87, 34 L.Ed.2d 155 (1972). In *Moore v. Illinois*, 408 U.S. at 795, 92 S.Ct. at 2568, the United States Supreme Court stated:

"We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case."

Nor do we believe there is constitutional requirement for the prosecution to provide a defendant with personal notes as to a case. The requirement is to provide the defendant with evidence favorable to him.

■ The testimony of Mullowney was used to impeach Charlotte. Although Charlotte was originally a prosecution witness, we do not believe it can be seriously questioned that she was a witness favorable to the defendant.

Charlotte's testimony at the trial as to her description of the actual shooting varied greatly from her testimony before the grand jury. Her testimony before the grand jury implicated Skjonsby whereas her testimony at the trial was to the effect that the shooting was accidental or in self defense and was favorable to Skjonsby. Upon less than a casual reading of the transcript, it is apparent that Charlotte was a witness favorable to the defendant at trial. As such, we do not believe any evidence of impeachment of Charlotte could in any manner be deemed favorable to Skjonsby within the purview of *Brady, supra.*

■ Skjonsby also asserted that the State committed prejudicial error by failing to disclose the detailed addresses of all potential witnesses prior to trial. He asserted that the failure to give complete addresses injured his defense and curtailed his attorney's efforts to investigate the matter fully. The State supplied the defendant with the cities wherein the witnesses resided. The record does not reflect the defendant informed the State of any witness which could not be located as a result of being supplied with only the city address of each potential witness. Furthermore, the defendant did not show at any time during the trial where it prejudiced him and we fail to see any prejudice to the defendant.

The next issue raised by Skjonsby is that the trial court deprived him of important constitutional rights in denying his motion to suppress certain evidence. Prior to trial, Skjonsby moved to suppress certain statements attributed to him and certain physical evidence taken from his automobile. The trial court suppressed certain statements made by him during three phone conversations at the police station; however, the trial court denied his motion to suppress statements made in room 118 and statements made by him while in the Biltmore parking lot together with physical evidence seized from his car.

Skjonsby asserted that his fourth, fifth and fourteenth amendment rights guaran-

teed by the United States Constitution and the North Dakota Constitution were violated. Specifically, Skjonsby asserted that all the statements attributed to him in room 118 should have been suppressed because at that time he was either in custody or the focus of investigation was upon him. Skjonsby also asserted that he was subject to police questioning or its functional equivalent.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) the United States Supreme Court held that the prosecution may not use statements stemming from the "custodial interrogation" of a defendant unless it demonstrates the use of procedural safeguards effected to secure the privilege against self-incrimination. However, the *Miranda* court did not prohibit all questioning by police officers investigating crime, as the following passage from that decision reflects:

"Our decision is not intended to hamper the traditional function of police officers in investigating crime. See *Escobedo v. Illinois*, 378 U.S. 478, 492, 84 S.Ct. 1758, [1765], 12 L.Ed.2d 977, 986. When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigation may include inquiry of persons not under restraint. General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present." *Miranda v. Arizona*, 384 U.S. 436, 477–478, 86 S.Ct. 1602, 1629–1630, 16 L.Ed.2d 694, 725–726.

The decision went on to state that "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Miranda v. Arizona*, 384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.

■ Before the procedural requirements of a *Miranda* warning are necessary, a two-pronged showing must be met in that the defendant must be in custody and he must be interrogated. *Miranda v. Arizona, supra.*

■ According to the State's version of the facts, Sgt. Lawyer and Officer Jorgenson were present in the room when Skjonsby made several incriminating statements. Sgt. Lawyer, upon entering the room, exclaimed, "What happened?" or "Who did this?" Without any further questions or statements, Skjonsby replied, "I did this. I went crazy. I left the room and came back. The gun is in the car." Officer Jorgenson then asked, "Where is the car?" and Skjonsby replied that the car was outside. The police officers also obtained the keys to Skjonsby's automobile at this time. After the above-set out dialogue Officer Jorgenson handcuffed Skjonsby and read him his *Miranda* rights. No further questions were asked at this time. According to Skjonsby's version of the facts, no questions were answered by him in room 118 and he was not read his *Miranda* rights until he was at the police station.

In this instance, we believe the questions propounded by the police officers were general on-the-scene investigation questions and were not directed at any particular person. The responses supplied by Skjonsby in this respect were in effect unsolicited or volunteered statements and were not barred by the fifth amendment, nor does the holding in *Miranda v. Arizona, supra*, bar their admissibility.

■ Skjonsby also asserted that statements made by him in the parking lot to identify his car as well as the physical evidence seized from his car (the gun) should have been suppressed.

Skjonsby's statement in room 118 initially alerted the police officers that "The gun is in the car." The testimony and affidavits of Officers Caulfield and Jorgenson established that it was Skjonsby who initiated the conversation relating to the identification of his car. Skjonsby's initial responses were not the results of questioning by the officers.

Further, even if the statements by Skjonsby in the Biltmore parking lot were

in violation of the fifth amendment, we believe the seizure of the gun was legal because the police were aware of the car as a result of previous admissible statements by Skjonsby, and the discovery of his car was inevitable. Skjonsby had earlier volunteered that the gun was in his car. With this information, the officers could have ascertained the model, make, and license number of all cars owned by Skjonsby by calling the State Department of Motor Vehicles. Based on this, we conclude that even if the statements by Skjonsby in the Biltmore parking lot were violative of his fifth amendment rights, the gun nevertheless was properly seized pursuant to the inevitable discovery doctrine. See *State v. Phelps*, 297 N.W.2d 769 (N.D.1980).

## TRIAL PROCEEDINGS

The next major issue raised by Skjonsby is that the trial court denied him due process of law, the right to a fair trial, and equal protection of the law because of several errors during the trial proceedings.

Skjonsby contended that the trial court committed prejudicial error in failing to grant his motion for a mistrial after an alleged improper comment by the prosecutor during the voir dire of the jury.

Skjonsby asserted that the prosecutor's comment that "someone will not get up and say I did it" was an impermissible infringement upon his right not to testify under the fifth amendment and violated the statutory rights afforded an accused under NDCC § 29–21–11.[19] Skjonsby further asserted that this comment forced him to take the stand (and possibly change trial strategy) or have the jurors negatively view his silence.

■ A fundamental principle of constitutional law is that the prosecution may not comment upon a defendant's failure to testify in a criminal case. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *State v. Flohr*, 310 N.W.2d 735 (N.D.1981). In this instance the record reflects the following statement by the prosecutor out of hearing of the jury:[20]

"I think the record should reflect that that statement was made in light of a question posed to that same witness immediately prior to it being posed, and that is a statement was made by myself that what you see on television isn't exactly the way it occurs, something like that, that this isn't like a Perry Mason television set and I said Mr. Garaas may—I did not say the defendant was not going to jump up. I said someone or anyone or a person, however it was worded, will not get up and say, 'I did it.'"

■ We believe the comments must be considered in the context in which they were made, and, after so doing, we believe it would take a strained interpretation of the prosecutor's comments to find that such statements were an improper comment on Skjonsby's fifth amendment right. Neither can we conclude that the defendant was forced to take the stand because of the statement.

The next issue raised by Skjonsby is that the prosecutor's opening statement denied him a fair trial and was prejudicial. Skjonsby asserted that the court committed prejudicial error to allow both the amended indictment and the bill of particulars to be read to the jury; that the opening statement by the prosecutor was more in the nature of testimony rather than a recitation of facts which the State sought to prove; and that the State failed to comply with NDCC § 29–21–01[21] by informing the jury,

---

**19.** NDCC § 29–21–11 provides as follows:

"In the trial of a criminal action or proceeding before any court or magistrate of this state, whether prosecuted by information, indictment, complaint, or otherwise, the defendant, at his own request and not otherwise, shall be deemed a competent witness, but his neglect or refusal to testify shall not create or raise any presumption of guilt against him. Nor shall such neglect or refusal be referred to by any attorney prosecuting

the case, or considered by the court or jury before whom the trial takes place."

**20.** The record does not include a transcript of voir dire of the jury. However, the quoted statement by the prosecutor was not refuted by Skjonsby.

**21.** NDCC § 29–21–01 provides in part as follows:

before evidence was offered, that the defendant had pled not guilty to the charged crimes.

 With regard to the initial failure of the State or the clerk to inform the jury that Skjonsby had pled not guilty to the charges in the indictment, we note that NDCC § 29–21–02 provides that the court, for good reasons and in its sound discretion, may order a departure from the procedure prescribed in NDCC § 29–21–01. We also note that in this instance the State recited to the jury that the defendant had pled not guilty to the charges of the indictment after one witness had testified. That witness, Robert Drenth, drew several drawings of the Biltmore complex which were introduced into evidence for purposes of demonstrating the layout of the Biltmore complex. However, Drenth was not involved in the investigation of the case and his testimony did not pertain to any facts of the case other than the drawings he made. Furthermore, we believe the jury would have surmized that if the defendant had pled guilty the need for a trial no longer existed, and being there was a trial the defendant had actually not pled guilty. Based on the events in this case as discussed earlier, we do not believe the trial court abused its discretion in permitting the State to recite to the jury that the defendant pled not guilty to the offenses in the indictment after Drenth testified.

 With regard to the State's opening statement, in *State v. Marmon*, 154 N.W.2d 55, 62 (N.D.1967), we said:

"The purpose of an opening statement is to inform the jury what the case is all about and to outline to it the proof which the State expects to present, so that the jurors may more intelligently follow the testimony as it is presented. In such statement, counsel for the State should outline what he intends to prove, and it is not necessary that he name the witnesses who will present each bit of evidence. In outlining his proposed case, counsel should be allowed considerable latitude. Only where the prosecutor deliberately attempts to misstate the evidence will such opening statement be ground for reversible error."

See also, *State v. Flohr, supra.*

In this instance the prosecution's opening statement satisfies the rationale set down in *State v. Marmon, supra.* Furthermore, within these guidelines, we do not believe it was error to read the bill of particulars to the jury.

 The next issue raised by Skjonsby is that the trial court committed prejudicial error by allowing the coroner's certificate into evidence. Skjonsby asserted that the coroner's certificate was not relevant and invaded the province of the jury. The coroner's certificate described the cause of death as "gunshot wound through heart and right lung" and in response to the question of whether or not death was by unlawful means, suicide, homicide or accidental stated that death was by homicide. The coroner's certificate also stated in response to the question, whether or not further investigation was recommended, that murder charges were pending against Richard Skjonsby. Additionally, the coroner, Dr. D. H. Lawrence, testified that in his opinion death "was caused by a bullet wound entering the left chest, transgressing or penetrating both walls of the left ventricle of the heart and continuing through the right lung and exiting through the right side of the back."

In this instance we do not believe the admission into evidence of the coroner's certificate is grounds for reversal. We believe the coroner's certificate, coupled with the testimony of the coroner, explained and established that the coroner's opinion was that the cause of death was a gunshot wound through the heart. This opinion as to the cause of death would be admissible under any concept of relevancy. Further,

"The jurors having been impaneled and sworn, the trial must proceed in the following order:
1. If the information or indictment is for a felony, the clerk or state's attorney must read

it, and must state the plea of the defendant to the jury. In all other cases this formality may be dispensed with;"

we do not believe that the inclusion of the term "homicide" in the coroner's certificate invaded the province of the jury as to the cause of death because that cause was clearly set out in the certificate as "a gunshot wound through the heart." The coroner merely complied with the statutory requirements.[22]

The next issue raised by Skjonsby is that he was denied a fair trial because certain exhibits were allowed into evidence without the establishment of a proper chain of custody. In particular, Skjonsby asserted that eleven exhibits should not have been introduced into evidence because there was a break in the chain of custody and a lack of foundation.[23]

Skjonsby asserted that the break in the chain of custody occurred when these exhibits were referred to certain FBI examiners for testing and the examiners did not testify at trial concerning alterations made in the exhibits during testing.

■ A proper chain of custody is a foundational requirement to account for the whereabouts of physical evidence up until the time it is admitted at trial and to insure that the physical evidence is in substantially the same condition at the time it is admitted into evidence. See State v. Lange, 255 N.W.2d 59 (N.D.1977); Gleson v. Thompson, 154 N.W.2d 780 (N.D.1967).

In State v. Lange, supra at 66, we cited State v. Johnson, 239 N.W.2d 239 (Minn. 1976), for a description of the chain of custody rule as follows:

"There can be no rigid formulation of what showing is necessary in order for a particular item of evidence to be admissible. Rather, admissibility must be left to the sound discretion of the trial judge. [Citations omitted.] He must be satisfied

that, in all reasonable probability, the item offered is the same as the item seized and is substantially unchanged in condition. [Citations omitted.]

"Admissibility should not depend on the prosecution negativing all possibility of tampering or substitution, but rather only that it is reasonably probable that tampering or substitution did not occur. Contrary speculation may well affect the weight of the evidence accorded it by the factfinder but does not affect its admissibility. [Citations omitted.]"

■ In this instance we do not believe the trial court abused its discretion in allowing the exhibits into evidence over the defendant's objection. Prior to the admission of these exhibits, the State established that the items were taken into custody by the police department and kept in their custody in an evidence footlocker before being sent to the FBI. The exhibits were received by the FBI in a single sealed container and were eventually returned by registered mail to the police department. An FBI agent described the procedure and safeguards used by the FBI in examining the items. The FBI agent testified that alterations on the exhibits were marked as such on the exhibit and alterations which were made to the exhibits were the result of examinations done by the various personnel at the FBI. Based on the testimony adduced prior to the admission of these exhibits, we believe that a proper foundation was established for their admissibility and that the trial court did not abuse its discretion in allowing these exhibits into evidence.

■ Next, Skjonsby contended that the trial court abused its discretion in allowing expert testimony into evidence without

22. The coroner's certificate was prepared pursuant to NDCC § 11–19–03, which provides as follows:

"If the coroner does not deem it necessary to hold an inquest in a case brought to his attention, he shall file with the clerk of the district court of the county within which the dead body is found a certificate setting forth all the facts in relation to the case."

Although this statute provides that the certificate may set forth all the facts in relation to

the case, case law may require that the certificate in order to be introduced in evidence contain only those facts within the knowledge of the coroner, or if it does contain facts outside of his knowledge, his statement as to how those facts were obtained.

23. These exhibits were a .32 caliber pistol, a manilla envelope, pants and belt worn by Skjonsby on 26 March 1980, Skjonsby's boots, shirt, vest, and five paper bags.

proper qualification. He asserted the trial court committed reversible error by allowing the alleged expert testimony of FBI agent Ronald Rawalt over his objection.

Rawalt testified in substance that in his opinion the broken glass in room 118 was caused by a high speed velocity projectile and could not have been caused by a low speed projectile such as being kicked with a foot. Skjonsby asserted that this opinion testimony should not have been allowed because it was based upon an examination of a photograph of the scene and was not the result of an on-the-scene examination.

Rule 702 of the North Dakota Rules of Evidence governs the admission of expert testimony and provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

In *South v. National Railroad Passenger Corp.*, 290 N.W.2d 819, 831 (N.D.1980), we outlined the following test for the admission of expert testimony under Rule 702, NDREv.:

"The test for admission of expert testimony under Rule 702, NDREv, is whether or not such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue and whether or not the witness is qualified as an expert. The determination to admit or not admit expert testimony under Rule 702, NDREv, rests within the sound discretion of the trial court, and its determination will not be reversed on appeal unless the court has abused its discretion. *Olson v.*

*A. W. Chesterton Co.*, 256 N.W.2d 530 (N.D.1977); *Stein v. Olhauser*, 211 N.W.2d 737 (N.D.1973)."

See also, *State v. Dachtler*, 318 N.W.2d 769, (N.D.1982).

In *South v. National Railroad Passenger Corp.*, supra at 832, we quoted from an Oregon Supreme Court case as follows:

"The factor which determines if a subject is a proper one for expert testimony is whether the answer of an expert can be of appreciable help to the jury. [Citation omitted.] It depends upon whether the subject is such that the expertise of the witness gives him a special insight superior to that of the average juror."

In this instance the qualifications of Agent Rawalt established that he had the knowledge, skill, experience, education, and training in the area of broken glass to assist the trier of fact. Agent Rawalt also testified as follows:

"These photographs are sufficient in quality to determine: one, the location of impact, and whether or not the object breaking the window was a high-speed or low-speed projectile, and to differentiate between the two, a high speed would be something like a missile, shot from a gun, a bullet, something like that attains a high speed, a very high velocity. A low speed would be like a fist, a club, a rock, something just moving in a much lower velocity."

Agent Rawalt went on to testify that, based on the photographs, the object breaking the window was a high-speed projectile such as a bullet.

Because Agent Rawalt testified that the pictures were of sufficient quality to permit making a determination, we believe his testimony was admissible to aid the jury and we do not believe the trial court abused its discretion in permitting this testimony.[24]

---

24. In this instance we also note that the trial court gave the following instruction on expert testimony:

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates.

"Duly qualified experts may give their opinions on questions in controversy at a trial. To assist you in deciding such questions, you may consider the opinion with the reasons given for it, if any, by the expert who gives the opinion. You may also consider the qualifications and credibility of the expert.

"You are not bound to accept an expert opinion as conclusive, but should give to it the weight to which you find it to be entitled. You may disregard any such opinion if you find it to be unreasonable."

The next issue raised by Skjonsby is that the State's substantive use of Charlotte's grand jury testimony over his objection denied him a fair trial, the right to confrontation, the right to due process of law, violated evidentiary rules and was prejudicial error.

Initially we note that Rule 801(d)(1)(i) of the North Dakota Rules of Evidence provides that:

"A statement is not hearsay if:

". . . The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (i) inconsistent with his testimony but, if offered in a criminal proceeding, was given under oath and subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition . . . ."

The comments to Rule 801 provide that:

"Subdivision (d)(1)(i) follows Rule 801, Uniform Rules of Evidence, allowing prior inconsistent statements always to be used as substantive evidence in civil cases and, if the prior statement was made under oath in criminal cases. This varies from Rule 801 of the Federal Rules of Evidence, which requires that the prior statement be made under oath in all cases. See the discussion of Rule 801, Federal Rules of Evidence, in State v. Igoe, 206 N.W.2d 291 (N.D.1973)."

See also, *State v. Kolb*, 239 N.W.2d 815 (N.D.1976); *Beck v. Lind*, 235 N.W.2d 239 (N.D.1975).

 Based on these authorities we believe it cannot be seriously argued against the proposition that North Dakota law contemplates permissive use of Charlotte's prior inconsistent statement to the grand jury as substantive evidence. However, we have a further issue whether or not the use of Charlotte's prior inconsistent statements, in this instance, violated Skjonsby's confrontation rights.

In *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), the United States Supreme Court held that a state statute which provides that "evidence of a statement made by a witness is not inadmissible by the hearsay rule if the state-

ment is inconsistent with his testimony at the hearing and is offered in compliance with" a statute which requires that the witness be given an opportunity to explain or deny the prior statement at some point in the trial, does not violate the defendant's right of confrontation guaranteed by the sixth amendment and made applicable to the states by the fourteenth amendment. See also, *State v. Igoe*, 206 N.W.2d 291 (N.D.1973). The thrust of *California v. Green, supra*, is that the ability of counsel for the defendant to cross-examine the witness at the time of the trial regains any lost protections in the use of out-of-court statements as substantive evidence. However, the Supreme Court in *California v. Green, supra*, left open the precise question of whether or not apparent lapse of memory affected a defendant's right to cross-examine so as to make a critical difference in the application of the confrontation clause.

 Thus, because of Charlotte's testimony at trial of a complete lack of memory of her testimony before the grand jury allegedly as a result of her use of painkilling drugs, Skjonsby asserted that Charlotte was completely unavailable to him at the time of trial for cross-examination and that his rights of confrontation were infringed. We disagree.

The record reflects that Charlotte's alleged lack of memory as to the events before the grand jury was not complete. At one point in her testimony before the trial jury Charlotte stated that she did not recall being before the grand jury. However, she did testify before the trial jury that she recalled that the sheriff's department transported her to Fargo to testify before the grand jury. Charlotte also testified that she knew she was before the grand jury from 10:00 a. m. until approximately 5:00 or 6:00 p. m.; that she met and talked to her attorney at the courthouse; that her attorney gave her a can of pop; and that she took medication during the noon hour. Charlotte generally denied recalling any of her testimony before the grand jury. Her testimony before the grand jury was similar to her testimony at trial except as it con-

cerned the factual circumstances surrounding the actual shooting. In this respect her testimony at trial was that the shooting was accidental or in self-defense and was entirely favorable to Skjonsby. We cannot help but agree with the State's position that Charlotte's lack of memory was selective and that therefore she was available for cross-examination. See *Vogel v. State*, 96 Wis.2d 372, 291 N.W.2d 838 (1980).[25] Charlotte was cross-examined at trial and the circumstances of her grand jury testimony were explored, as well as her use of pain-killing drugs. Although there was no opportunity to cross-examine Charlotte before the grand jury, that testimony as well as the account given at trial were skillfully challenged at trial through cross-examination under oath in the presence of the jury. Further, the question of the possible effect of drugs upon Charlotte was also presented to the trial jury. Similarly, the question of the genuineness of Charlotte's claim of lack of memory was a matter for the jury to decide. Based on this, we believe Skjonsby's lack-of-confrontation claim is meritless.

Skjonsby also asserted that the use of grand jury testimony as substantive evidence denied him effective assistance of counsel. In view of the fact that Skjonsby was able to cross-examine Charlotte at trial concerning her grand jury testimony and in light of our previous discussion of the confrontation issue, this claim merits no further discussion.

Skjonsby also asserted that the use of the grand jury testimony was too inflammatory for its probative value and therefore denied him due process of law. Skjonsby argued that prior inconsistent statements cannot support a central element of a crime and that, in this instance, the use of the inconsistent statements should have been limited because they provided only a scintilla of evidence. See *United States v. Orrico*, 599 F.2d 113 (6th Cir. 1979).

Examples of an inflammatory nature cited by Skjonsby are statements relative to his mental health and statements relative to his treatment for alcoholism. The record reflects that Charlotte's testimony at trial prior to the actual reading of her grand jury testimony dealt with her relationship with Skjonsby and his treatment for alcoholism. Thus, the jury was already aware of Skjonsby's alcoholism treatment before the grand jury testimony was read. Further, no specific objection as to this portion of the grand jury transcript was made either in chambers or during the reading of the grand jury testimony. Even if a specific objection to statements concerning Skjonsby's alcoholism treatments or mental health had been made, we do not believe the trial court would have abused its discretion in permitting the testimony because the testimony was already before the jury and was merely cumulative.

Skjonsby also asserted that he was denied due process of law in that the enactment by this Court of Rule 801(d)(1) of the North Dakota Rules of Evidence denied him substantive rights and exceeded the rule-making authority of this Court.

We do not believe Rule 801(d)(1) denied Skjonsby of any substantive rights. Rule 801(d)(1) sets forth the procedural requirements which must be met to permit the use of prior inconsistent statements. The rule, in essence, is a procedure to safeguard and protect the right to confrontation by requiring that the declarant be available for cross-examination at trial concerning the inconsistent statements. The jury is then in a position to evaluate and give necessary weight to the inconsistent statements. This necessarily will preserve a method for a party to prove its case if a witness changes his story on the stand and deprives the party calling him of evidence essential to his case. The rule, in essence, procedurally preserves, rather than denies, substantive rights.

The next issue raised by Skjonsby is that the State's cross-examination of him was extremely prejudicial, denied him due process of law, violated certain evidentiary rules, constituted prosecutorial overreaching, and violated other of his constitutional rights. Skjonsby asserted that dur-

---

**25.** Charlotte later pled guilty to the charge of having committed perjury at the trial.

ing the State's cross-examination of him, a standing objection on seventeen grounds was made in response to the following question:

> "Q. Did you make any phone calls that night of March 26 where you stated it wasn't an accident or self-defense?"

The record reflects that this question was asked after Skjonsby testified that the shootings were accidental or in self-defense.

The trial court initially suppressed several statements made by Skjonsby during phone conversations from the police station which were overheard by police officers. During these phone conversations Skjonsby, in substance, related that he had done something very, very bad and had shot Charlotte and her boyfriend at the Biltmore. The State, before cross-examining the defendant, requested that the court allow use of the suppressed statements overheard by police officers for impeachment during cross-examination of Skjonsby and, if necessary, during the State's rebuttal through the police officer present at the police station and through Rand Haapapuro, the recipient of one of the phone calls. The court granted the request.

Skjonsby asserted that the question, and line of questioning following it, constituted cross-examination concerning his failure to make exculpatory statements at the time of his arrest and that this constituted a denial of due process. Citing *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). We disagree.

In *Doyle v. Ohio*, 426 U.S. at 619, 96 S.Ct. at 2245, the United States Supreme Court held that the use of a defendant's silence, at the time of arrest and after receiving *Miranda* warnings, for impeachment purposes, violated due process. That holding is not applicable to this case because the impeaching evidence was used regarding actual statements made by Skjonsby rather than to post-arrest silence.

The United States Supreme Court has recognized that evidence which was initially suppressed may be used for impeachment purposes if the defendant exercises his right to testify and on direct examination testifies inconsistently with the evidence initially suppressed. See, *United States v. Havens*, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980), *rehearing denied* 448 U.S. 911, 101 S.Ct. 25, 65 L.Ed.2d 1172 (1980); *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). Consistent with these decisions, we believe the line of questioning of Skjonsby was properly permitted by the trial court for impeachment purposes.

Next, Skjonsby contended that the trial judge assisted the prosecution and thus denied him a fair trial.

Our review of the entire transcript and the particular instances raised by Skjonsby reflects that during the lengthy trial, the judge exercised considerable patience, courtesy and impartiality toward all parties who appeared and exercised sound judicial discretion in conducting the trial.

One of the instances raised by Skjonsby relates to the introduction of medication purportedly taken by Charlotte during the time of her testimony before the grand jury. Without going into details, we believe it is sufficient to say that the trial judge exercised sound judicial control and discretion in handling the introduction of that evidence.

We must keep in mind that the interests of justice require that the defendant in a criminal action receive a fair trial, not a perfect trial [*State v. Allen*, 237 N.W.2d 154 (N.D.1975)], and our review of the transcript in this case reflects that the trial judge strived to achieve that end.

Skjonsby also contended that the prosecution was guilty of overreaching, which denied him a right to a fair trial. Skjonsby asserted that the prosecution denied him due process of law by obtaining a conviction through the use of testimony known by the State to be false.

We do not believe the record discloses that the State knowingly or intentionally used false testimony. We must recognize that at different times a witness may change his or her testimony in a substantial way. It necessarily follows that if this

situation is confronted, one of the versions of the testimony would be false. In those situations it is a jury's function to give appreciable weight and credibility to the witness and believe one or the other versions of the testimony. The problem is particularly accented in this case where critical differences in the testimony may on one hand completely exonerate the defendant and on the other hand incriminate him. Under these circumstances we do not believe the prosecution overreached by introducing both versions of the testimony. This is especially so in recognizing that one of the objectives of the prosecutor is to get at the truth through valid means.

We also point out that it is apparent that although Charlotte was originally called by the prosecution, her testimony at trial was favorable to Skjonsby. It is also clear that the State need not vouch for her credibility (Rule 607 NDREv) and that the truth-finding process requires that both versions of Charlotte's testimony be introduced so that jury can make an appropriate determination of the truth.

■■■ The next issue raised by Skjonsby is that the testimony of certain State witnesses violated evidentiary rules, and it constituted prejudicial error for the court to allow the testimony of certain witnesses into evidence because that testimony was hearsay and in violation of Rule 613 of the North Dakota Rules of Evidence.[26] Skjonsby asserted that these statements were extrinsic evidence of prior inconsistent statements of a State's witness (usually Charlotte) without the witness (usually Charlotte) having an opportunity explain or deny the statements.

In *Starr v. Morsette*, 236 N.W.2d 183, 188, note 2 (N.D.1975), we said:

"The new Federal Rules of Evidence eliminate the requirement of prior opportunity to explain or deny. Instead, they provide that the witness must have the opportunity at some time to explain or deny, but that the judge may dispense with the requirement if the interests of justice require. Rule 613(b). They also provide that the witness need not be shown a contradictory statement, but it must be shown or disclosed to his counsel on request. Rule 613(a). We believe these rules represent the best available reconciliation of conflicting interests, and we specifically approve them."

See also, explanatory notes to Rule 613, NDREv.

During the course of Skjonsby's trial, Charlotte was called as a witness by the prosecution and by Skjonsby and was afforded an opportunity to explain or deny the statements through examination and cross-examination by Skjonsby. Accordingly, we believe the impeachment requirements contained in Rule 613 were complied with in this case.

■■■ Next Skjonsby contended that the evidence was insufficient to sustain a conviction of murder and attempted murder and that the trial court committed error in denying his motion for acquittal pursuant to Rule 29 of the North Dakota Rules of Criminal Procedure.

Pursuant to Rule 29(a), NDRCrimP, a motion for a judgment of acquittal is properly granted only if the evidence is insufficient to sustain a conviction of the offense. Our review of the record reflects that abundant evidence exists on which the jury could base its verdict.

The next issue raised by Skjonsby is that the State's closing argument was improper. Specifically, he argued that it was improper to characterize his attorney as a "salesman" which touches upon his right to effective assistance of counsel. He also asserted that the prosecutor referred to matters not in evidence, such as a conspiracy between Charlotte and Skjonsby to contrive a story. Skjonsby further asserted that the State's closing arguments led the jury to confuse

---

**26.** Rule 613(b), NDREv, provides as follows:

"Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admission of a party-opponent as defined in Rule 801(d)(2)."

impeachment testimony and substantive evidence.

■■■■ The vigor with which a case is argued to a jury is under the control and discretion of the trial court, and this exercise of discretion will not be reversed by this Court unless a clear abuse of discretion is shown. *State v. Flohr*, 310 N.W.2d 735 (N.D.1981). The closing argument must be considered as a whole. Counsel has a right to present legitimate arguments on the evidence to the jury which has the responsibility to evaluate and draw appropriate inferences therefrom. *State v. Flohr, supra, State v. Wahlberg*, 296 N.W.2d 408 (Minn. 1980). We have examined the prosecution's closing argument and find no grounds for reversal.

The next issue raised by Skjonsby is that the trial court erred in denying his post-trial motion for arrest of judgment, or in the alternative for acquittal, or in the alternative for a new trial. Our earlier discussion of the principles of law involved in the issues raised in this appeal leads us to the conclusion that the trial court properly denied these motions.

■■■■ Skjonsby also asserted that he did not have a complete or partial transcript of the proceedings to point out with particularity the alleged defects and errors, [see NDRCrimP 33(a) ] and as a result he could only be general in making his post-trial motions rather than specific, and therefore the trial court erred by ruling on his post-trial motions under these conditions.

Counsel for Skjonsby sat through the entire trial and had full opportunity to note any defects and errors, and thus any allegations that his post-trial motions could not be pointed out with particularity are baseless.

■■■■ The next issue raised by Skjonsby is that the cumulative effects of the errors in his case demand a reversal of the conviction. Earlier we observed that mere quantity of alleged errors is not in itself adequate. In *State v. Mehralian*, 301 N.W.2d 409 (N.D.1981), we said that error is reversible only if it appears from the record that the error was prejudicial, that substantial injury resulted, and a different decision probably would have resulted absent the error. We have examined the voluminous record and we conclude that there is no basis for reversing Skjonsby's conviction because of the cumulative effect of any alleged errors.

Skjonsby also asserted the trial court erred when it denied his motion for a new trial on the basis of newly discovered evidence.

The defendant contended and argued that the perjury of Charlotte demanded his conviction be set aside and that he be granted a new trial on the basis that the prosecution had information that Charlotte was going to lie, but did not share this information with the defendant.

■■■■ In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Court held that the prosecutor as a servant of the law must always be faithful to his client, the government, which has an overriding interest that "justice shall be done." As a servant of the law, his aim is to prevent the guilty from escaping and to protect the innocent from suffering. *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). From this it necessarily follows that the prosecutor is under no constitutional duty to routinely deliver his entire file to the defendant. *Agurs, supra*. (We are not suggesting that the prosecutor should at no time make his file, minus personal notes, etc., available to the defendant.) The proper standard in determining which material must be given to the defendant is whether or not the material will have a direct bearing on finding the defendant guilty or innocent. The Court, through a footnote in *Agurs, supra*, rejected the concept that the impact the evidence may have on the defendant's ability to prepare for trial determines if the prosecutor should make it available to the defendant.

■■■■ In the instant case the defendant relied upon *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in support of his position that he is entitled to a new trial because Charlotte gave false testimony which was different from the

testimony she gave before the grand jury. The defendant claimed that the prosecutor knew this and was compelled to give this information to the defendant. Significantly, the *Brady* case referred to *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, 90 A.L.R. 406 (1935), which involved perjured testimony which was known to the prosecutor but nevertheless was used in prosecuting the case, whereas in the instant case the perjured testimony occurred at the trial. The prosecutor, in his argument to the jury, politely indicated that the witness may be exaggerating or embellishing upon the facts. The defendant contended that the prosecutor was aware that Charlotte was going to lie because Miss Mullowney testified that Charlotte stated to her that she (Charlotte) was going to lie. As it turned out, the perjured [27] testimony given by Charlotte was favorable to the defendant more so than the testimony she gave before the grand jury. If anything at all, it may have in retrospect given the defense some concern to shift its tactics, but otherwise if the testimony had been the same as was given before the grand jury, which as it now turns out was the truth, the testimony would have been much more damaging to the defendant than it was. Nevertheless, the jury found the defendant guilty even in view of Charlotte's "favorable testimony" to the defendant.

We are not aware of any rule of law, and none has been brought to our attention, requiring the prosecutor in a case such as this to make known to the defendant that he acquired information from another person indicating that Charlotte would lie as a witness. The contention of the defendant in this respect is neither supported by the facts nor the law.

We have carefully examined each alleged error and have determined that none has merit, and therefore conclude that the conviction should be, and accordingly is, affirmed.

27. Charlotte Skjonsby, after the trial, pled guilty to the charge of having committed perju-

ERICKSTAD, C. J., and VANDE WALLE, PEDERSON and PAULSON, JJ., concur.

ry at the trial and has been sentenced.