STATE of North Dakota, Plaintiff
and Appellee,

v.

Glenn ALLERY, Defendant
and Appellant.

Cr. No. 821.

Supreme Court of North Dakota.

July 1, 1982.

Arne F. Boyum, Jr., State's Atty., Rolla, for plaintiff and appellee.

Chapman & Chapman, Bismarck, for defendant and appellant; argued by Charles L. Chapman, Bismarck.

SAND, Justice.

This is an appeal by the defendant, Glenn Allery [Allery], from a jury verdict of guilty for theft of property worth more than $100, a class C felony, in violation of North Dakota Century Code § 12.1–23–02.

On 20 July 1980 the remains of a freshly butchered Hereford calf and a black white-faced calf were found in a pasture near Allery's father's home in Couture Township in Rolette County, North Dakota. A 1967 Ford two-door automobile belonging to Germaine DeCoteau, Allery's wife at the time, was also found in the pasture, along with a butcher knife, several other knives, and a hacksaw. Two law enforcement officers testified that they observed hair from calf hides and blood stains in the trunk of the automobile.

On 22 July 1980 Irvin Schoonover reported to the Rolette County sheriff's office that a Hereford calf and a black white-faced calf were missing from a pasture he rented in Currie Township of Rolette County, near Dunseith, North Dakota. Schoonover testified that each calf had a value of approximately $400.00. Schoonover also testified that he observed tire tracks in the pasture and that he found a power steering belt near the tracks.

Allery was ultimately charged with theft of property and a jury returned a verdict of guilty. The State's evidence implicating Allery in the theft of the cattle was mostly circumstantial.

Germaine DeCoteau testified that she was married to Allery and that he had access to her car at the time of the alleged theft of property. Germaine also testified that she assumed Allery had taken her car at that time.

Barry DeCoteau, Germaine's 11-year old son, testified on direct examination that he had gone for a ride in the summer of 1980 with Allery when Allery drove the car into a pasture near Dunseith, North Dakota. Barry testified that Allery chased cattle in the pasture with the car. However, Barry testified that Allery did not stop the car when they were in the pasture, and, further, that after they left the pasture, Allery took him home. Barry also testified that he talked with law enforcement officers Ken Sayers and Bryant Mueller about the incident in March 1981; however, Barry testified that he did not remember if his testimony on direct examination was the same as he told Sayers and Mueller.

Sayers testified, without objection by counsel, as follows concerning his questioning of Barry in March 1981:

"A. He recalled being with Glenn and that he said he was along with Glenn in a pasture south of Dunseith sometime during the fall or summer, he didn't remember the date. It was nice. It was during the summertime or there's no snow and he said he was with Glenn at the time, and that they separated the cows and that Glenn had shot a cow. He further stated to me that he helped—he helped somewhat, Glenn load the cow into the trunk and I asked him how he could do that and he said we used a bumper jack to get the cow in the trunk, and that's about it."

Mueller testified, without objection by counsel, as follows concerning the questioning of Barry in March of 1981:

"Q. Sheriff Mueller, did Barry DeCoteau say anything about a pasture?

"A. Yes, he did.

"Q. What did he say?

"A. Said that he and Glenn stopped at a pasture.

"Q. Did Barry DeCoteau say he went into the pasture?

"A. Yes, sir.

"Q. Did he say what—what the defendant did when they got into the pasture?

"A. Yes, he did.

"Q. And what did he tell you the defendant did?

"A. He said that they drove around the pasture and Glenn chased some cows with the car; that he made Barry get out and help him chase some cows until they had one cow singled out.

"Q. And at that point did Barry DeCoteau tell you what the defendant did?

"A. Yes, he did.

"Q. What did he tell you the defendant did?

"A. He said he took a gun that he had in the car and shot the cow.

"Q. Did he mention any more cows?

"A. No, sir.

"Q. Did Barry DeCoteau say where he went after he left the pasture?

"A. Yes, he did.

"Q. And what did he—Where did he say he went?

"A. After loading the cow Glenn took Barry back to the trailer house and dropped him off.

"Q. And whose trailer house?

"A. Germaine DeCoteau's trailer house."

Mueller also testified that he questioned Allery about the cattle in April 1981 after Allery was read his *Miranda* warnings. Mueller testified, without objection by counsel, concerning the questioning of Allery:

"Q. And what did you ask him [Allery]?

"A. I asked him—Well, I first I told him I had pretty good information concerning these cattle, and I asked him if he was going to tell me about it.

"Q. What did he say?

"A. He said, 'Well, you'll have to prove it.'

"Q. Did you say anything else to him?

"A. I guess I asked him something like, you know, 'How did you load a three or four hundred pound calf by yourself?'

"Q. And did he reply to you?

"A. Yes, he did.

"Q. What did he say?

"A. He laughed and said, 'Well, maybe I'm the incredible hulk.'

"Q. Was there anything else to that conversation? Do you recall anything else?

"A. I believe I asked another question about whether or not he wanted to tell me anything about it.

"Q. And what did he say?

"A. He just grinned and did not reply."

Judy McCloud testified that Allery stopped by her house in either July or August of 1980 and offered to sell her some meat contained in a plastic garbage bag. She further testified that the meat had an odor of spoiled meat and that she did not buy it.

The State also presented evidence that red-brown cattle hair was found on the handle of a knife found in the pasture, that cattle blood was found on paper towels found at the scene, and that hair from cattle hides and blood stains were observed in the trunk of the automobile.

Allery was found guilty by a jury of theft of property and sentenced to three years in the state penitentiary to be followed by two years of probation. As part of his sentence, he was also required to make restitution to Schoonover in the amount of $750.00. Allery appealed to this Court.

The first issue raised by Allery concerned the testimony by Mueller at trial as to statements made by Allery during questioning in April of 1981. Allery asserted that the use of Mueller's testimony was prejudi-

cial error because it was an improper comment upon his right to remain silent.

Initially, we note that Mueller testified that Allery was given a *Miranda* warning prior to making statements in April 1981, and that the testimony of Mueller concerning those statements was not objected to at trial by counsel for Allery.

In *State v. Schneider*, 270 N.W.2d 787, 792 (N.D.1978), we found that testimony concerning a defendant's decision to remain silent[1] was an improper comment upon the defendant's privilege of self-incrimination and was "constitutional error which may be reviewed on appeal even though not objected to at the time of trial."

Our initial consideration is whether or not the testimony of Mueller concerning his questioning of Allery, as previously set out, constituted an improper comment upon Allery's right to remain silent. If that testimony was an improper comment upon Allery's right to remain silent, then we must determine whether the error constituted "harmless error" or "obvious error" so fundamental that a new trial or other relief must be granted, even though there was no objection at the time. Rule 52, NDRCrimP; *State v. Schneider, supra.*

We do not believe Allery's statements to the effect of "Well, you'll have to prove it," and "Well, maybe I'm the incredible hulk," in and of themselves can be construed to be improper comments upon the defendant's right to remain silent. We must remember that these statements were made within a short time after Allery was advised of his *Miranda* rights and they do not convey a decision to remain silent. However, the testimony of Mueller that Allery, in response to whether or not he wanted to tell Mueller anything about the incident, "grinned and did not reply" approaches an improper comment on his right to remain silent. This statement coupled with the two previous statements may have had the effect of an improper comment upon Allery's right to remain silent. The testimony of Mueller does not reflect that any further questions were asked of Allery on that date in April. Although Mueller's testimony concerning Allery's responses approaches an improper comment on the right to remain silent, we do not believe those statements, by themselves, would be grounds for reversal.[2] However, in this instance we must also consider the effect of those statements and the prior inconsistent statements of Barry DeCoteau in conjunction with the remaining evidence implicating Allery.

The crucial issue for our consideration relates to the possible use as substantive evidence of prior inconsistent statements made by Barry DeCoteau. Barry testified at trial that Allery did not stop the car in the pasture. Law enforcement officers Sayers and Mueller testified at trial that Barry DeCoteau had made a prior statement in March 1981 about Allery's activities in the pasture which was inconsistent with Barry's trial testimony. Sayers and Mueller testified that Barry had previously told them that he had been with Allery in the pasture when Allery shot a cow and loaded it in the car.

North Dakota Rule of Evidence 801(d)(1)(i) provides as follows:

"(d) Statements Which Are Not Hearsay. A statement is not hearsay if:

(1) Prior Statement by Witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is (i) inconsistent with his testimony but, if offered in a criminal proceeding, was given under oath and subject to the penalty of perjury at

---

1. In *State v. Schneider, supra,* a law enforcement officer asked the defendant whether or not he was operating the motor vehicle and the defendant replied, "I will remain silent." The police officer ultimately testified, without objection by counsel, to this conversation, and, after considering the entire record, we held that the police officer's testimony about the defend-

ant's right to remain silent was harmless error beyond a reasonable doubt.

2. For a discussion of nonverbal reactions to accusations constituting an adoptive admission under the hearsay rule, see 87 A.L.R.3d 698, Non-verbal Reaction to Accusation, § 8, p. 733.

a trial, hearing, or other proceeding, or in a deposition"

The comments to North Dakota Rule of Evidence 801(d)(1)(i) provides as follows:

"Subdivision (d)(1)(i) follows Rule 801, Uniform Rules of Evidence, allowing prior inconsistent statements always to be used as substantive evidence in civil cases and, if the prior statement was made under oath in criminal cases. This varies from Rule 801 of the Federal Rules of Evidence, which requires that the prior statement be made under oath in all cases. See the discussion of Rule 801, Federal Rules of Evidence, in *State v. Igoe*, 206 N.W.2d 291 (N.D.1973)."

See also, *State v. Skjonsby*, 319 N.W.2d 764 (N.D.1982).

■ Pursuant to this rule a prior inconsistent statement may be used as substantive evidence in a criminal case if the prior inconsistent statement was made under oath. *State v. Skjonsby, supra; State v. Igoe*, 206 N.W.2d 291 (N.D.1973).

■ In this instance the record does not reflect that the prior inconsistent statement of Barry was given under oath. Further, no exception to the hearsay rule has been called to our attention which would have permitted the introduction of Barry's prior inconsistent statement for substantive purposes. Based on this, we believe that the testimony of law enforcement officers Sayers and Mueller concerning the prior inconsistent statement of Barry should not have been used as substantive evidence, but pursuant to Rule 613, NDREv, could only be considered for purposes of impeachment.

■ In this instance the record does not reflect that the court gave, or that either counsel requested, a jury instruction limiting the use of Barry's prior inconsist-

ent statement for impeachment purposes only and not for substantive purposes. Such an instruction, if not given by the court, in the interests of a fair trial should havé been requested by either party,[3] and the failure to give or request such an instruction under the totality of circumstances in this case was error.

In the absence of such an instruction or an objection to the testimony by counsel for Allery, we must consider whether or not the failure to object to the testimony or give appropriate instructions was "harmless error" or "obvious error." Rule 52, NDRCrimP; *State v. Schneider, supra.* The comments to Rule 52, NDRCrimP, provide the following three types of error which may be assigned for review by the appellate court:

". . . (1) harmless error or error not prejudicial to the defendant; (2) reversible error or error that was prejudicial and to which objection was made in the trial court; and (3) obvious error or error so fundamental that a new trial or other relief must be granted even though the action was not objected to at the time."

See also, *State v. Schneider, supra.*

■ In this instance the evidence implicating Allery with the theft of the cattle was largely circumstantial. The circumstantial evidence does permit an inference that Allery was guilty. However, the only direct evidence implicating Allery was the prior inconsistent statement by Barry which should have been admitted and limited only for impeachment purposes and not for substantive purposes. Added to the direct evidence is the possible effect of the testimony about statements made by Allery. The totality of circumstances may and should be taken into consideration in resolving procedural issues and admission of evidence. It

---

**3.** While the judge is initially responsible to correctly instruct the jury on the law of the case, Rule 30, NDRCrimP, the attorneys have the professional responsibility to request or object to specific instructions of points of law resulting from testimony or on developments during trial, Rule 30, NDRCrimP. This primary responsibility cannot be shifted to the judge but should be shared by both the prosecution and the defense in the same manner as the defense counsel has the professional responsibility (Canon 6, Code of Professional Responsibility) to assist in making the record show that the guilty plea was intelligently, accurately and voluntarily made. See, *State v. Reaves*, 254 N.W.2d 488 (Iowa 1977). Counsel for defendant at trial was not the same counsel on appeal.

is conceivable that any single item considered in itself may not cause a change, but the accumulation of several doubtful items in one case may be grounds for reaching a different conclusion. In this instance, actions of the defendant after the *Miranda* warning as described by the witness, such as "he just grinned and did not reply" or he said, "You'll have to prove it" or maybe "I'm the incredible hulk" in themselves may not have been sufficient to warrant a new trial and may not be grounds generally for upsetting a jury verdict. However, in this instance the evidence was primarily, if not solely, circumstantial and as a result these actions warrant greater scrutiny. Added to this, we have the testimony of law enforcement officers Sayers and Mueller who testified about Barry's prior inconsistent statements which the jury could and probably did use as substantive evidence. This testimony in all probability was the straw that broke the camel's back.

Because there was no instruction to limit the testimony of Barry for impeachment purposes and because the remaining evidence was largely circumstantial and, in one respect may have approached improper comment on Allery's right to remain silent, we believe that the error with respect to the prior inconsistent statement of Barry was so fundamental that a new trial, or other relief, must be granted even though there was no obligation at trial.

 Whether or not the circumstantial evidence presented in this case would permit an inference of guilt goes to the weight of the evidence and does not go to the sufficiency of the evidence. Accordingly, in line with the recent United States Supreme Court case, *Tibbs v. Florida*, —— U.S. ——, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982) we reverse the jury verdict and remand the case for retrial.

If a retrial is pursued, we believe special care should be taken by the parties to insure that any witnesses do not make improper comments concerning Allery's right to remain silent, and that proper limitations on the use of Barry's prior inconsistent statements be observed.

For reasons stated in this opinion, the jury verdict is reversed and the case is remanded for retrial.

ERICKSTAD, C. J., and PAULSON, PEDERSON and VANDE WALLE, JJ., concur.