STATE of North Dakota, Plaintiff and Appellee,

v.

Richard W. SKJONSBY, Defendant and Appellant.

Cr. No. 1149.

Supreme Court of North Dakota.

Dec. 29, 1987.

---

Robert Garold Hoy, State's Atty., Fargo, for plaintiff and appellee. Appearance by Bruce D. Quick, Bismarck.

Lundberg, Nodland, Lucas, Schulz & Lervick, PC, Bismarck, for defendant and appellant; argued by Irvin B. Nodland.

LEVINE, Justice.

Richard W. Skjonsby [Skjonsby] appeals from an order of the district court denying his application for post-conviction relief. We affirm.

This case arises from a shooting incident which occurred on March 26, 1980. The facts are set out in detail in *State v. Skjonsby*, 319 N.W.2d 764 (N.D.1982) ["Skjonsby I"] and *State v. Skjonsby*, 338 N.W.2d 628 (N.D.1983) ["Skjonsby II"].

Skjonsby was tried and convicted for the murder of Michael Kurtz [Kurtz] and the attempted murder of Charlotte Skjonsby [Charlotte]. His convictions were affirmed on appeal to this court. *Skjonsby I, supra.*

Skjonsby subsequently applied to the District Court of Cass County for post-conviction relief pursuant to Chapter 29–32, N.D.C.C.[1] Skjonsby asserted that he was denied effective assistance of counsel at

---

1. The 1985 Legislature repealed Chapter 29–32, N.D.C.C., and replaced it with an updated version of the Uniform Post–Conviction Procedure Act. *See* 1985 N.D.Sess.Laws Ch. 366 [codified at Chapter 29–32.1, N.D.C.C.]. The present proceeding was commenced prior to the effective

trial, that he was incapable of assisting in his own defense, and that a psychiatric evaluation performed upon him at the State Hospital was invalid because two of the participating doctors were at that time engaged in illegal counterfeiting activities. The trial court did not afford Skjonsby an evidentiary hearing, but summarily dismissed Skjonsby's application. We reversed on appeal, holding that Skjonsby was entitled to an evidentiary hearing on his allegations. We remanded to the district court for an evidentiary hearing limited to the three issues raised by Skjonsby and appointed a different district judge to preside over the evidentiary hearing. *Skjonsby II, supra.*

The evidentiary hearing was conducted June 18–28, 1985. Skjonsby was represented by court-appointed counsel. Over thirty witnesses testified and 124 exhibits were received into evidence. After receiving briefs on the legal issues, the trial court issued its memorandum decision and order denying the application for post-conviction relief.

Skjonsby raises two issues on appeal: ineffective assistance of counsel and his mental incompetence to assist in his defense. Although these issues as formulated by Skjonsby are somewhat interrelated, we will address each separately.

## I. Ability to Assist in Defense

Skjonsby asserts that the trial court erred in finding that he was mentally competent to assist in his own defense. The relevant statutory provision is Section 12.-1-04-04, N.D.C.C.:

"*12.1–04–04. Disposition of mentally unfit defendants.* No person who, as a result of mental disease or defect, lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted, or sentenced for the commission of an offense so long as such incapacity endures."

date of Chapter 29–32.1, and is therefore governed by Chapter 29–32, N.D.C.C. *See Jensen v.*

Whether a defendant is mentally competent to stand trial is a question of fact for the trial judge. *State v. Heger,* 326 N.W.2d 855, 858 (N.D.1982).

We review this issue within the context of the Uniform Post–Conviction Procedure Act, Chapter 29–32, N.D.C.C. The burden of establishing a basis for post-conviction relief rests upon the petitioning defendant. *State v. Kunkel,* 366 N.W.2d 799, 803 (N.D.1985). Proceedings under the Act are civil in nature, and all rules and statutes applicable in civil proceedings are available to the parties. *Varnson v. Satran,* 368 N.W.2d 533, 536 (N.D.1985). Thus, factual findings made by the trial court in post-conviction proceedings will not be disturbed on appeal unless they are clearly erroneous. Rule 52(a), N.D.R. Civ.P.; *Varnson v. Satran, supra.* On appeal, the complaining party bears the burden of demonstrating that error exists in the trial court's findings of fact. *E.g., Johnson v. Hamill,* 392 N.W.2d 55, 59 (N.D.1986); *Byron v. Gerring Industries, Inc.,* 328 N.W.2d 819, 821 (N.D.1982).

Skjonsby contends that the results of psychological tests conducted before trial were misinterpreted and that, upon review by Skjonsby's new experts, these tests show that Skjonsby was at the time of trial suffering from a mental disease or defect which rendered him unable to assist in his own defense. On three separate occasions before trial, the Minnesota Multiphasic Personality Inventory ["MMPI"] was administered to Skjonsby. Two of these tests were administered by Dr. Harper, a private psychologist retained on behalf of Skjonsby, and the third was administered by the staff at the State Hospital. It was the opinion of Dr. Harper and the State Hospital staff that Skjonsby was not at that time suffering from a mental disease or defect which rendered him incapable of assisting in his defense.

Skjonsby particularly attacks the conclusion of Dr. Harper that the MMPI conduct-

*State,* 373 N.W.2d 894, 896 n. 1 (N.D.1985).

ed in November, 1980, shortly before trial, produced an invalid result because Skjonsby was "faking" the test. Dr. Harper testified that the test results would support two possible theories: either Skjonsby was seriously mentally ill or he was "faking" the test. Based upon other information available, including his extensive interviews with Skjonsby, his examination of other test results, and his personal observations, Dr. Harper concluded that Skjonsby had intentionally "faked" the November MMPI.

At the post-conviction hearing Skjonsby presented the testimony of Dr. Rasmussen, a psychotherapist, and Dr. Erickson, a psychiatrist, who disputed Dr. Harper's findings. They each testified that their interpretation of the MMPI results led to the conclusion that Skjonsby did not fake the November test and that Skjonsby indeed suffered from a mental disease or defect in 1980 which rendered him unable to assist in his defense.

Each side also presented additional evidence regarding Skjonsby's physical and mental condition before and during his trial in 1980. According to testimony and records introduced at the hearing, virtually every person who had significant contact with Skjonsby before and during his trial, including numerous mental health professionals, the physician who treated Skjonsby in the Cass County Jail, the original trial judge, and Skjonsby's trial counsel, was of the opinion that Skjonsby did not appear to be suffering from any mental disease or defect and that he was competent to stand trial. Skjonsby also presented various witnesses who testified regarding Skjonsby's excessive weight loss, bleeding ulcer, depression, and medications prescribed during his incarceration before trial.

■ The trial court weighed the conflicting evidence and found that Skjonsby was not suffering from a mental disease or defect in 1980 and was not incapable of assisting in his defense. In so holding, the court noted that the State's evidence was derived primarily from witnesses who had personal contact with Skjonsby in 1980, and who had conducted interviews and administered psychiatric testing at that time. In this regard, it is important to note that at trial Skjonsby did not raise the issue of mental inability to assist in his defense. In fact, it was not until filing an amended brief in the initial post-conviction proceedings, on February 4, 1983, that Skjonsby first asserted that he had been unable to assist in his defense. Thus, the expert testimony of Dr. Rasmussen and Dr. Erickson was based not upon personal contact and testing of Skjonsby in 1980 [inasmuch as neither of them met Skjonsby until more than two years later], but rather upon after-the-fact review of Skjonsby's 1980 test results.

Questions of credibility of witnesses are for the finder of fact, including the evaluation of expert witness testimony. *Johnson v. Hamill, supra*, 392 N.W.2d at 59. We have previously discussed our review of cases where the trial court was faced with conflicting opinions by expert witnesses:

> " 'The trial court was thus confronted with a classic "battle of the experts". Consequently, this is a case where the court could have arguably relied upon either party's expert witness. However, upon hearing the testimony, observing the witnesses' demeanor, and judging their credibility, the court chose to rely upon the defendants' expert. Such a choice between two permissible views of the weight of the evidence is not clearly erroneous.' [Citations omitted.]" *Johnson v. Hamill, supra*, 392 N.W.2d at 59 [*quoting from Byron v. Gerring Industries, Inc., supra*, 328 N.W.2d at 822].

We conclude that the trial court's finding that Skjonsby was not suffering from a mental disease or defect in 1980 which rendered him incapable of assisting in his own defense is not clearly erroneous.

## II. Ineffective Assistance of Counsel

Skjonsby contends that he was denied his Sixth Amendment right to effective assistance of counsel. In *State v. Thompson*,

359 N.W.2d 374, 377 (N.D.1985), we discussed the appropriate standards for judging a claim of ineffective assistance of counsel, as enunciated by the Supreme Court of the United States in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):

> "In *Strickland,* the Court held that '[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' *Id.* 104 S.Ct. at 2064. The Court established a two-part test for determining whether counsel's assistance was so defective as to require reversal of a conviction:

> > " 'First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' *Id.*

> "*Strickland* directs that in examining the first element—whether counsel's performance was deficient—'[j]udicial scrutiny of counsel's performance must be highly deferential.' *Id.* 104 S.Ct. at 2065. The proper measure of attorney performance is 'simply reasonableness under prevailing professional norms,' considering all the circumstances from the defense counsel's perspective at the time. *Id.* However, because it is all too easy to second-guess an unsuccessful counsel's defense through the distorting effects of hindsight, in making that inquiry 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' ' *Id.* 104 S.Ct. at 2065–66 [citation omitted].

> "In examining the second element—whether the deficient performance was prejudicial—we must inquire, considering the totality of the evidence before the judge or jury, 'whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.' *Id.* 104 S.Ct. at 2069. It is the defendant's burden to 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' *Id.* 104 S.Ct. at 2068."

The defendant must identify the specific acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. *Strickland v. Washington, supra,* 466 U.S. at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695; *State v. Thompson, supra,* 359 N.W.2d at 378. The burden is upon the defendant to establish both elements of the two-part test and failure to do so is fatal to his ineffective assistance of counsel claim. *State v. Gutsche,* 405 N.W.2d 295, 296 (N.D.1987); *State v. Micko,* 393 N.W.2d 741, 746 (N.D. 1986). Thus, the reviewing court need not address both components of the inquiry if the defendant makes an insufficient showing on one. *Strickland v. Washington, supra,* 466 U.S. at 697, 104 S.Ct. at 2069, 80 L.Ed.2d at 699; *State v. Micko, supra,* 393 N.W.2d at 746–747.

Skjonsby has taken what amounts to a "shotgun" approach in raising numerous allegations of incompetence and improper conduct by the various attorneys who at one time or another have represented him in connection with this case. In order to put Skjonsby's allegations in proper perspective, a brief review of the circumstances culminating in his trial is appropriate.

Shortly after the shooting on March 26, 1980, Skjonsby retained attorney Brian Nelson. Nelson considered the possibility of presenting a "mental state" defense and hired Dr. Sharbo and Dr. Harper to evaluate Skjonsby. It soon became apparent, however, that Skjonsby would be financially unable to retain Nelson. Thus, Robert Ramlo and Wayne Anderson were appointed to represent Skjonsby pursuant to the public defender contract then in effect in Cass County. During the time that Ramlo and Anderson served as his attorneys of record, Skjonsby was also being visited in jail by Fred Kraemer, an attorney who had represented him on other matters. Kraemer was at the time romantically involved with Charlotte Skjonsby, whom Richard Skjonsby considered to be his common-law wife, and was representing Charlotte in a tort action against the Biltmore Hotel, where the shooting had occurred. Although she had been ordered by the court not to have any contact with Skjonsby, Charlotte visited him on several occasions while he was at the State Hospital in Jamestown.

Due to the continual interference by Charlotte and Kraemer, the attorney-client relationship between Skjonsby and his court-appointed counsel deteriorated, and Skjonsby attempted to discharge them. Ramlo and Anderson sought to withdraw, citing ethical considerations, and were permitted to do so. Kraemer, who had in the meantime succeeded to the public defender contract, was appointed to represent Skjonsby. The State quickly pointed out the obvious conflicts of interest which would arise if Kraemer·were allowed to continue as counsel for Skjonsby, and Kraemer was removed within days of his appointment.

Jonathon Garaas was then appointed to represent Skjonsby. By that time, Skjonsby had presented numerous, conflicting stories concerning the shooting to his attor-

neys and others. Garaas was placed in a most unenviable position, faced with a client, Skjonsby, and an eyewitness, Charlotte, who had told various inconsistent stories in the past but who now insisted that the shooting of Charlotte had been accidental and that the shooting of Kurtz had been self-defense. Garaas conducted interviews and. investigations to aid in preparation of Skjonsby's defense. Garaas also pursued the earlier contacts with Dr. Sharbo and Dr. Harper. Garaas arranged for Skjonsby to be interviewed by Dr. Harper shortly before trial in November, 1980. Having tested and examined Skjonsby in April and November of 1980, Dr. Harper advised Garaas that Skjonsby was not suffering from a mental disease or defect, and was competent to assist in his defense. Dr. Harper also opined that Skjonsby was not suffering from a mental disease or defect on March 26, 1980, which would provide any basis for a diminished mental capacity defense. Dr. Harper's conclusions were consistent with the opinions of the staff of the State Hospital. Because none of the experts who had examined Skjonsby was able to support a defense based upon mental disease or defect, Garaas, on behalf of Skjonsby, withdrew the previously filed notice of intent to rely upon an insanity defense. See Rule 12.2, N.D.R.Crim.P.

The case proceeded to trial with Garaas presenting a defense based upon Skjonsby's claim that he shot Kurtz in self-defense and that Charlotte had been shot accidentally while he and Kurtz fought for the gun. Of particular importance was Skjonsby's assertion that the gun belonged to Kurtz. Charlotte corroborated his story at trial, although her trial testimony was in contradiction to her testimony before the grand jury.[2] Following a month-long trial, Skjonsby was convicted of the murder of Kurtz and the attempted murder of Charlotte.

Skjonsby now raises a plethora of allegations challenging the actions of the attor-

---

**2.** Charlotte subsequently pleaded guilty to perjury in connection with her testimony at trial.

See Skjonsby II, supra, 338 N.W.2d at 629.

neys who represented him throughout the course of his case. As previously noted, the claims raised by Skjonsby regarding ineffective assistance of counsel are closely interwoven with his claim that he suffered from a mental disease or defect which rendered him unable to assist in his defense. To the extent that Skjonsby claims that his attorneys took advantage of him · and presented an inappropriate defense because he was mentally unable to make appropriate decisions for himself, our affirmance of the trial court's finding that Skjonsby was capable of assisting in his defense is largely dispositive of this issue.

■ The predominant issue raised by Skjonsby which relates to his alleged inability to make rational choices for himself is his claim that the self-defense story was concocted entirely by others and that he was forced to go along with this story at trial. Skjonsby has at various times asserted that Charlotte, Kraemer, Garaas, or some combination thereof, invented the self-defense story and forced him to participate in its presentation at trial.[3] Skjonsby's asserted lack of complicity in the fabrication of this perjury is belied by more than just the evidence of his mental state. The State introduced into evidence a tape recording which had been made by Charlotte and Skjonsby during one of her illicit visits to the State Hospital on June 3, 1980. The trial court found that this tape recording

"appears to be the first attempt on the part of Richard and Charlotte to get their story straight for purposes of presentation at trial.... What I do hear from this tape is the development of a false story, the trial story, of the incidents of March 26, 1980, with the full participation of both Richard and Charlotte Skjonsby and the correction of some of the story by Richard himself. This leads me to the conclusion that the story as presented at the trial was not the prod-

uct of Fred Kraemer or Jonathan Garaas, but the product of Richard and Charlotte Skjonsby and further that Richard was a full participant in that story unencumbered by the so-called domination of Charlotte."

Skjonsby's participation in the fabrication of the perjured story is a question of fact. There is ample evidence to support the trial court's findings of fact on this issue, and we conclude that the findings are not clearly erroneous. Rule 52(a), N.D.R.Civ.P.

In light of the court's findings that Skjonsby did not suffer from a mental disease or defect which affected his ability to assist in his defense and that Skjonsby was a willing and knowing participant in the fabrication and perjurious presentation of the self-defense theory, only one substantial allegation of ineffective assistance of counsel remains. Skjonsby contends that Garaas erred in basing Skjonsby's defense upon self-defense because the evidence did not support it. Skjonsby in effect contends that Garaas should have realized that the self-defense version of the shooting was a fabrication and should have conducted further investigations which would have demonstrated the falsity of that story. At its essence, the question presented is whether an attorney, faced with the circumstances presented here, had a duty to disbelieve his client and conduct an inquiry to specifically determine whether his client was telling the truth.

We have previously, albeit in a markedly different context, implied that an attorney is generally entitled to rely upon the truthfulness of his client's representations in formulating legal strategy. In *Martinson Bros. v. Hjellum,* 359 N.W.2d 865 (N.D. 1985), the attorney, Hjellum, settled a foreclosure action against his clients, the Martinsons, through an agreement which provided that no deficiency judgment could be sought if the Martinsons' net worth was less than $90,000. Acting upon his clients'

---

**3.** Skjonsby apparently now concedes that Garaas was not involved in fabricating the self-defense story.

assurances that their net worth was less than $90,000, Hjellum advised settlement on these terms and abandoned other possible defenses. The Martinsons submitted a financial statement showing a net worth of $46,000, but after investigation, the opposing party established that their net worth exceeded $90,000 and obtained a deficiency judgment against the Martinsons. The Martinsons subsequently sued Hjellum for malpractice, alleging that he had been negligent in failing to pursue other available defenses. In affirming a judgment in favor of Hjellum, we stated:

> "[W]e agree with the trial court's finding that under Hjellum's strategy, he reasonably believed he had protected his clients from a deficiency judgment by virtue of the agreement that Oakes would not seek a deficiency judgment if the Martinsons' net assets were less than $90,000. John Martinson assured Hjellum that the financial statement would show a true net worth of less than $90,000. Hjellum decided to set his settlement strategy on this assurance from his clients rather than on the nonseverability defense which he believed to be of doubtful application to the December 1977 agreement."

*Martinson Bros. v. Hjellum, supra,* 359 N.W.2d at 874. Although *Martinson* arises within a different context, it does provide support for the conclusion that an attorney may generally rely upon the truthfulness of his client's representations.

 In determining an attorney's obligations when presented with potential client perjury, we must also look to the applicable ethical standards. Canon 7 of the North Dakota Code of Professional Responsibility [4] provides that "A lawyer should represent a client zealously within the bounds of the law." In so doing, however, a lawyer may not knowingly use perjured testimony or false evidence. DR 7-102(A)(4), N.D.C.P.R. Elaborating upon this prohibition against use of knowingly perjured testimony, Ethical Consideration 7-26 states:

> "The law and Disciplinary Rules prohibit the use of fraudulent, false, or perjured testimony or evidence. A lawyer who knowingly participates in introduction of such testimony or evidence is subject to discipline. A lawyer should, however, present any admissible evidence his client desires to have presented unless he knows, or from facts within his knowledge should know, that such testimony or evidence is false, fraudulent, or perjured."

Thus, an attorney is not prohibited from presenting testimony on behalf of a client, unless he or she knows or should know that the testimony is perjured. In the absence of such knowledge, the duty to represent one's client zealously within the bounds of the law requires the attorney to present any admissible evidence the client desires to have presented.

Numerous courts have discussed the appropriate standard for assessing whether an attorney "knew" that the client would commit perjury. For example, in *Johnson v. United States,* 404 A.2d 162, 164 (D.C. 1979), the court concluded that the fact that the defendant's intended trial testimony was inconsistent with his prior statements was insufficient to establish that the defendant's testimony would be perjurious:

> "We agree with appellant that the inconsistency between his two proffered defenses was insufficient to establish that the second proffer, the intended testimony, was false and that the trial court's conclusion to the contrary was based on surmise. Section 7.7 speaks to a situation in which the falsity of the defendant's testimony is known and not merely suspected. Likewise, our previous cases in which this problem arose involved situations in which the attorney knew, based on independent investigation of the case or on prior discussions with the client, that the defendant's testimony was false. It was in that context that we held that the attorney could, consistent

4. Effective January 1, 1988, the Code of Professional Responsibility will be replaced by the recently adopted North Dakota Rules of Professional Conduct.

with the defendant's right, limit his or her representation in accordance with § 7.7.... Where, as here, the veracity or falsity of the defendant's testimony is conjectural, the ethical dilemma does not arise." [Citations and footnotes omitted].

See also *Butler v. United States*, 414 A.2d 844, 850 (D.C.1980).

Similarly, in *Whiteside v. Scurr*, 744 F.2d 1323, 1328 (8th Cir.1984), *rev'd sub. nom on other grounds, Nix v. Whiteside*, 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986), the United States Court of Appeals for the Eighth Circuit stated that mere suspicion, conjecture, or inconsistent statements are insufficient to establish that the client will testify falsely:

"Appellant first argues that counsel improperly acted on the basis of mere suspicion that appellant would testify falsely. The reason why counsel believes that the defendant intends to testify falsely is an important threshold question because ' "[w]here ... the veracity or falsity of the defendant's testimony is conjectural, the ethical dilemma does not arise." ' *Butler v. United States*, 414 A.2d at 850, *citing Johnson v. United States*, 404 A.2d at 164. Both ABA Model Rule 3.3 and ABA Proposed Defense Function Standard 4–7.7 presuppose that defense counsel *knows* that the defendant's testimony will be false on the basis of either independent investigation or prior discussions with the defendant or both. Mere suspicion or inconsistent statements by the defendant alone are insufficient to establish that the defendant's testimony would have been false.... Counsel must act if, but only if, he or she has 'a firm factual basis' for believing that the defendant intends to testify falsely or has testified falsely.... It will be a rare case in which this factual requirement is met. Counsel must remember that they are not triers of fact, but advocates. In most cases a client's credibility will be a question for the jury." [Citations omitted].

Other cases are in accord. *See, e.g., In re Grand Jury Subpoena*, 615 F.Supp. 958, 969 (D.Mass.1985) ("It is fundamentally inconsistent with this obligation to require an attorney to ascertain the truth or falsity of his client's assertions. So long as the attorney does not have obvious indications of the client's fraud or perjury, the attorney is not obligated to undertake an independent determination before advancing his client's position."); *People v. Schultheis*, 638 P.2d 8, 11 (Colo.1981) ("A mere inconsistency in the client's story is insufficient in and of itself to support the conclusion that a witness will offer false testimony."); *Commonwealth v. Wolfe*, 301 Pa.Super. 187, 447 A.2d 305, 310 n. 7 (1982) ("it is crucial in this type of situation that the lawyer know for sure that actual perjury is involved; he must not merely suspect it").

The United States Court of Appeals for the Third Circuit, in *United States ex rel. Wilcox v. Johnson*, 555 F.2d 115, 122 (3d Cir.1977), has stressed that an attorney may not usurp the function of the judge or jury to weigh the evidence and determine guilt or innocence:

"If an attorney faced with this situation were in fact to discuss with the Trial Judge his belief that his client intended to perjure himself, without possessing a firm factual basis for that belief, he would be violating the duty imposed upon him as defense counsel. While defense counsel in a criminal case assumes a dual role as a 'zealous advocate' and as an 'officer of the court,' neither role would countenance disclosure to the Court of counsel's private conjectures about the guilt or innocence of his client. It is the role of the judge or jury to determine the facts, not that of the attorney.

"It is essential to our adversary system that a client's ability to communicate freely and in confidence with his counsel be maintained inviolate. When an attorney unnecessarily discloses the confidences of his client, he creates a chilling effect which inhibits the mutual trust

and independence necessary to effective representation. It is apparent that an attorney may not volunteer a mere unsubstantiated opinion that his client's protestations of innocence are perjured. To do so would undermine a cornerstone of our system of criminal justice."

*See also State v. Whiteside,* 272 N.W.2d 468, 470 (Iowa 1978); *State v. Lloyd,* 48 Md.App. 535, 429 A.2d 244, 248 (1981).

The danger of counsel becoming a trier of fact has been recognized by at least four justices of the Supreme Court. In a concurrence to *Nix v. Whiteside,* 475 U.S. 157, 189, 106 S.Ct. 988, 1006, 89 L.Ed.2d 123, 149 (1986), Justice Blackmun, joined by Justices Brennan, Marshall, and Stevens, noted that "attorneys who adopt 'the role of the judge or jury to determine the facts,' ... pose a danger of depriving their clients of the zealous and loyal advocacy required by the Sixth Amendment." [Citation and footnote omitted; quoting *United States ex rel. Wilcox v. Johnson, supra*]. In a separate concurring opinion, Justice Stevens added: "A lawyer's certainty that a change in his client's recollection is a harbinger of intended perjury—as well as judicial review of such apparent certainty—should be tempered by the realization that, after reflection, the most honest witness may recall (or sincerely believe he recalls) details that he previously overlooked." *Nix v. Whiteside, supra,* 475 U.S. at 190–191, 106 S.Ct. at 1007, 89 L.Ed.2d at 150 (Stevens, J., concurring).[5]

The underlying policies supporting the rule have been enunciated by Professor Brazil:

"A close look at the role of counsel and her relationship to her client reinforces this conclusion. An attorney in civil litigation is not an agent of adverse parties; defense counsel in a criminal matter is not an arm of the prosecution. Lawyers are not to perform the functions of judges or jurors. Instead, they are advocates whose primary responsibility is to pursue their clients' interests as vigorously as possible within the bounds of the law. To compel attorneys to monitor their clients' behavior, to pursue vigorously any suspicions that might occur to them about possible wrongdoing by their clients, and to develop evidence against the people they represent, would undermine the fundamental character of the attorney-client relationship and bastardize the role of defense counsel. Imposing such obligations on attorneys also would create pressure on clients to conceal information from their lawyers and to try to make the tactical judgments about the use of evidence that only attorneys are fully equipped to make. It seems unlikely that courts would impose duties on counsel that would have such negative effects. It follows that attorneys should interpret Disciplinary Rule 7–102(B)(1) as imposing upon them no obligation at all until *after* a suspicion that a client might have committed fraud or perjury has been converted into an undeniable conclusion by information counsel has acquired in the normal course of the representation and without actively investigating her client's credibility." Brazil, *Unanticipated Client*

5. In *Nix v. Whiteside, supra,* the Supreme Court was presented with a somewhat similar issue. The defendant claimed ineffective assistance of counsel because his attorney refused to participate in presenting clearly perjured testimony and persuaded the client not to testify falsely. After being advised by the client of his intention to testify falsely, the attorney threatened to advise the court of the perjured nature of the testimony, impeach the false testimony, and withdraw from the case. The client capitulated and did not present the anticipated false testimony. Upon conviction, the defendant sought federal habeas corpus relief based upon his assertion that his attorney's conduct had denied him effective assistance of counsel under the Sixth Amendment.

The Supreme Court concluded that counsel's conduct fell "well within accepted standards of professional conduct and the range of reasonable professional conduct acceptable under *Strickland.*" *Nix v. Whiteside, supra,* 475 U.S. at 171, 106 S.Ct. at 997, 89 L.Ed.2d at 137. The Court discerned that, at most, counsel's actions only prevented the defendant from presenting false testimony. Because the defendant had no "right" to present false testimony, counsel's actions in depriving his client of the contemplated perjury did not violate the Sixth Amendment's guarantee of effective assistance of counsel.

*Perjury and the Collision of Rules of Ethics, Evidence, and Constitutional Law,* 44 Mo.L.Rev. 601, 614 (1979).

It is within this context that we review Skjonsby's assertion that Garaas should have realized the falsity of the self-defense story and insisted upon presenting some other defense. With the wisdom of hindsight it may now be apparent that the defense chosen at trial may not have been the best possible alternative. Trial counsel, however, did not, in the fall of 1980, have knowledge of the ultimate jury verdict nor of the bizarre post-trial occurrences which now conclusively demonstrate that the self-defense story was untruthful. It has now been conclusively established, for example, that the gun belonged to Skjonsby, not Kurtz; Charlotte has pleaded guilty to perjury charges, thereby admitting that her testimony in support of the self-defense theory was untrue; and Skjonsby himself has admitted that he lied at his trial.

Trial counsel, however, was presented with an entirely different picture. Although Skjonsby had told a variety of conflicting stories to his prior attorneys, mental health professionals, and the police, he consistently throughout Garaas's representation insisted that the self-defense version was the truth. Garaas was also faced with Charlotte's numerous versions of "the truth." By the time of trial, however, she was corroborating Skjonsby's claim that the shooting was in self-defense.

In assessing Garaas's decision to proceed upon the self-defense theory, our scrutiny of counsel's performance must be highly deferential and must be evaluated from counsel's perspective at the time:

> "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.

> Cf. *Engle v. Isaac,* 456 U.S. 107, 133–134, 102 S.Ct. 1558, 1574–1575, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' See *Michel v. Louisiana, supra,* 350 U.S., [ ] at 101, 76 S.Ct., [158] at 164 [100 L.Ed. 83 (1955)]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. See Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U.L.Rev. 299, 343 (1983)."

*Strickland v. Washington, supra,* 466 U.S. at 689–690, 104 S.Ct. at 2065–2066, 80 L.Ed.2d at 694–695; *see also State v. Thompson, supra,* 359 N.W.2d at 377.

■ Applying this standard to the circumstances presented in this case, we conclude that Skjonsby has failed to meet his burden of demonstrating that he was denied effective assistance of counsel by Garaas's decision to rely, with Skjonsby's full cooperation, upon the defense of self-defense. When viewed from the perspective of counsel in 1980, without the distorting effects of hindsight, we believe counsel made a reasonable determination that the self-defense theory was the most desirable alternative to present at trial. Viewed from that perspective, we see no evidence that Garaas knew in 1980 that the self-defense theory and the testimony which would support it was a fabrication. His decision to proceed on that theory was a matter of trial strategy.

We find particularly illuminating on this issue the words of Justice Stevens in his concurring opinion to *Nix v. Whiteside, supra,* 475 U.S. at 190, 106 S.Ct. at 1007, 89 L.Ed.2d at 150:

"Justice Holmes taught us that a word is but the skin of a living thought. A 'fact' may also have a life of its own. From the perspective of an appellate judge, after a case has been tried and the evidence has been sifted by another judge, a particular fact may be as clear and certain as a piece of crystal or a small diamond. A trial lawyer, however, must often deal with mixtures of sand and clay. Even a pebble that seems clear enough at first glance may take on a different hue in a handful of gravel."

While it may now be "as clear and certain as a piece of crystal" that the self-defense theory was based upon a total lie, counsel at the time of trial was dealing with "mixtures of sand and clay."

It would be incongruous to grant a new trial to Skjonsby based upon allegations of ineffective assistance of counsel which have their underpinnings in Skjonsby's knowing, willing, and blatant perjury. It must be remembered that the ultimate focus of an inquiry into the alleged ineffectiveness of counsel must be upon the fundamental fairness of the challenged proceeding. *Strickland v. Washington, supra,* 466 U.S. at 696, 104 S.Ct. at 2069, 80 L.Ed.2d at 699; *State v. Thompson, supra,* 359 N.W.2d at 377. It borders on the preposterous for Skjonsby to level an attack upon the fairness of a proceeding based upon his own perjury.

In *Tipton v. Warden,* 28 Md.App. 206, 344 A.2d 204 (1975), a convicted defendant asserted that he had been denied effective assistance of counsel and a fair trial when his counsel failed, as promised, to bribe the trial judge to "fix" the outcome. The Court of Special Appeals sternly rejected his contentions:

"If Tipton's story that his trial was to be fixed by bribery should be found to be false, then the premise of his claim would disappear. If that story should be found to be true, it would demonstrate that what Tipton least wanted was a fair trial—that what he really sought was an unfair trial, a 'fixed' trial.

"The courts will not hear Tipton, or anyone else, complain that he was denied a fair trial because he failed in his attempt to prostitute justice and have an unfair trial." *Tipton v. Warden, supra,* 344 A.2d at 207.

In *Commonwealth v. McNeil,* 506 Pa. 607, 487 A.2d 802 (1985), the Supreme Court of Pennsylvania was presented with circumstances remarkably similar to the instant case. At his trial for rape, McNeil testified that he did not know the victim. After his conviction, however, McNeil recanted his trial testimony and admitted that he knew the victim. He further alleged that the victim, in concert with the complainant in another charge of rape against McNeil, had entered into a conspiracy to falsely accuse him of rape.

On appeal, McNeil alleged that his attorney had failed to render effective assistance of counsel because the attorney had failed to interview a witness who would have testified that McNeil and the victim knew each other. The court initially addressed counsel's performance:

"It is undoubtedly true that a defense attorney's failure to investigate potentially meritorious defenses or failure to interview witnesses whose testimony could prove beneficial and exculpatory can constitute ineffective assistance of counsel if no reasonable basis exists for counsel's failure.... However, the value of a particular defense or witness' testimony is not judged abstractly in the vacuum of what might have been but in the reality of what is; accordingly, the defendant must sustain his burden of proving how the 'road not taken' or the testimony of the uninterviewed witness would have been beneficial under the facts and circumstances of his case....

"Exposed to the light of reality, appellee's claim of ineffective assistance of counsel evaporates. The critical factor is that the newfound 'victims' conspiracy/consent' defense, and Mr. Gore's tes-

timony to support that defense, would not have been beneficial because it *would have utterly and disastrously contradicted appellee's trial testimony that he did not know the victim."* *Commonwealth v. McNeil, supra,* 487 A.2d at 806 (emphasis in original).

The court then addressed the inequity which would result if McNeil were granted a new trial under the circumstances presented:

"Having freely and deliberately chosen to offer testimony which he now asserts was false, appellee stands before this Court and attempts to reap a windfall new trial on account of his own perjury. The criminal justice system cannot and will not tolerate such an obvious and flagrant affront to the integrity of the truth determining process thinly disguised under the rubric of 'ineffective assistance.' As we stated in *Commonwealth v. Szuchon,* [506] Pa. [228], 484 A.2d 1365 (1984), to 'hold otherwise would create a situation wherein a defendant, by design, could build into his case ineffective assistance of counsel claims, thus guaranteeing himself a basis for a new trial if the verdict were adverse to him.' 484 A.2d at 1377." *Commonwealth v. McNeil, supra,* 487 A.2d at 807–808 (footnote omitted).

Just as McNeil was not allowed to reap a benefit from his deliberate perjury, Skjonsby may not now gain an advantage because of his deliberate attempt to subvert the truth-finding process through his own perjury at his trial.

We have thoroughly reviewed Skjonsby's remaining allegations of ineffective assistance of counsel and find them to be without merit. We conclude that Skjonsby has failed to meet his burden of demonstrating that counsel's performance was constitutionally deficient.

As a concluding point, we wish to commend the trial court for its exceptional handling of a most complex and difficult case. Review of the record demonstrates that the court extended every possible courtesy and protection to the defendant, even to the extent of allowing Skjonsby himself to cross-examine witnesses. The court's conduct of the lengthy evidentiary hearing was exemplary, and its findings and conclusions are clear, concise, and illuminating.

The order of the trial court denying the application for post-conviction relief is affirmed.

VANDE WALLE, Justice, concurring in result.

I concur in the result reached by the majority. In retrospect the instruction which Skjonsby's trial counsel requested on voluntary manslaughter as a lesser included offense to murder as a result of Skjonsby's "extreme emotional disturbance" may have been justified. In *State v. Skjonsby,* 319 N.W.2d 764 (N.D.1982), we appeared to conclude that because such a defense was inconsistent with his contention that his actions were in self-defense or accidental, no such instruction was warranted. That conclusion is apparently contrary to established law in North Dakota, although in *State v. Thiel,* 411 N.W.2d 66 (N.D.1987), a majority of the court attempted to distinguish the decision in *Skjonsby* from prior decisions such as *State v. Hazlett,* 16 N.D. 426, 113 N.W. 374 (1907), which held that a defendant is entitled to an instruction on all defenses of which there is any support in the evidence, whether such defenses are consistent or inconsistent. I write specially because I am concerned that despite the attempt in *Thiel* to reconcile our decision in *Skjonsby,* the latter decision may nevertheless be read to mean that inconsistent defenses are not permissible or that substantial evidence must exist before an instruction on an inconsistent defense is warranted. *Skjonsby* may appear to have imposed too strict requirements for such an instruction.

That issue is not, however, before us in this instance. Rather, Skjonsby argues that others, including his trial counsel, invented the self-defense theory and forced him to participate, and that his counsel should have realized that the self-defense theory was a fabrication which should have led to further investigations which would have demonstrated the falsity of that theory.

In addition to what is said in the majority opinion, it is obvious that trial counsel, if he

invented the self-defense theory, would not have requested the trial court for an instruction on voluntary manslaughter as a result of the several factors he therein asserted to establish extreme emotional disturbance. *State v. Skjonsby, supra,* at 779. Rather, it is likely that the trial counsel, faced with a client who insisted the action was in self-defense or an accident, nevertheless recognized that a voluntary manslaughter defense was more appropriate and requested such an instruction from the trial court. Although the requested instruction was denied, the responsibility is not his trial counsel's but, as the lower court concluded and the majority recognizes, was that of Skjonsby, who "was a willing and knowing participant in the fabrication and perjurious presentation of the self-defense theory, ..." It may be that the defense should have been that a crime, if one was committed, was only that of voluntary manslaughter as a result of "extreme emotional disturbance." The failure to defend solely on that rationale is, however, the responsibility of Skjonsby, not his trial counsel.